STATE OF CONNECTICUT *v.* STANLEY WILLIAMS
(AC 32975)

Lavine, Sheldon and Mihalakos, Js.

York cases suffered an injury caused by a defendant prior to having been threatened.

Argued May 16, 2012—officially released September 24, 2013

Lisa A. Vanderhoof, assigned counsel, with whom, on the brief, was Lisa J. Steele, for the appellant (defendant).

Nancy L. Chupak, senior assistant state's attorney, with whom, on the brief, were Maureen Platt, state's attorney, and Amy Sedensky, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The principal issue in this case concerns the reliability of eyewitness identification. Following oral argument in this court, our Supreme Court decided *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012). In *Guilbert*, our Supreme Court held, among other things,[1] that "testimony by a qualified expert on the fallibility of eyewitness identification is admissible under *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), when that testimony would aid the jury in evaluating the state's identification evidence." *State* v. *Guilbert*, supra, 221.

The defendant, Stanley Williams, appeals from the judgments of conviction, rendered following a jury trial, of two counts of robbery in the first degree in violation

[1] In *Guilbert*, our Supreme Court stated that "[m]any of the factors affecting the reliability of eyewitness identifications are either unknown to the average juror or contrary to common assumptions, and expert testimony is an effective way to educate jurors about the risks of misidentification. To the extent that [*State* v. *Kemp*, 199 Conn. 473, 507 A.2d 1387 (1986)] and [*State* v. *McClendon*, 248 Conn. 572, 730 A.2d 1107 (1999)] held to the contrary, they are hereby overruled." *State* v. *Guilbert*, supra, 306 Conn. 252–53.

of General Statutes § 53a-134 (a) (3) and two counts of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a).[2] The jury also found the defendant guilty of being a persistent dangerous felony offender in violation of General Statutes § 53a-40 (a). On appeal, the defendant claims that the trial court abused its discretion (1) with respect to its evidentiary rulings by (a) precluding expert testimony pertaining to the reliability of eyewitness identification[3] and (b) permitting an optometrist from the Department of Correction (department) to testify as to the defendant's need for eyeglasses, and (2) by denying his motions for reconsideration of the aforementioned rulings and for a new trial. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. On May 12, 2009, Satnam Kaur (Kaur), a native of India,[4] was working alone at Ideal Package Store on Hill Street in Waterbury (liquor store), which was owned by her husband. Previously, Kaur had worked in another store owned by her husband, which was located on Grove Street in Waterbury. At approximately 6:15 p.m., Kaur was waiting on a customer purchasing lottery tickets when the defendant entered the liquor store. Kaur observed the defendant walk to the rear of the store where containers of Heineken beer were displayed.

After the lottery customer left the liquor store, the defendant called out to Kaur, asking for the price of

---

[2] The defendant was charged in two informations for robberies he committed on May 12, 2009, and May 14, 2009. The court, *Damiani, J.*, consolidated the informations for trial.

[3] In view of our Supreme Court's decision in *Guilbert*, we sua sponte ordered the parties "to submit supplemental briefs of no more than [twelve] pages explaining how, if at all, *State* v. *Guilbert*, [supra, 306 Conn. 218], affects the issue regarding expert testimony that was raised on the defendant's appeal."

[4] English is not Kaur's native tongue. Although she has some English language fluency, she testified with the assistance of an interpreter.

one bottle of Heineken. Kaur told him the price, and the defendant called out again for the price of a twenty-four pack of Heineken. Kaur left the counter area to assist the defendant because they were the only two people in the store. Kaur wanted to help the defendant because she thought he was old, and she recognized him as a customer who had come into the Grove Street store when she had worked there. When she was approximately three feet from the defendant, she stated the requested price. She looked directly at the defendant's face and spoke to him as she would any other customer. The defendant, however, was not looking at her but was watching the lottery customer drive away.

When the lottery customer was gone, the defendant withdrew a large kitchen knife from his clothing,[5] grabbed Kaur with his left hand and held the knife to her neck with his right. The defendant pushed Kaur toward the cash register, causing her to fall to the floor. As she fell, Kaur pushed the knife away so it would not cut her neck, but she cut the palm of her left hand and the thumb of her right hand instead. The defendant continued to push Kaur toward the cash register and ordered her to give him the money in the register. Kaur refused and pushed the panic button. The defendant let go of Kaur, opened the lottery cash drawer, took approximately $400 and ran out of the liquor store. Kaur ran after him and grabbed his hood but was unable to hold on. Kaur returned to the store, dialed 911 and waited for the police to arrive. When the police arrived, Kaur was taken to Saint Mary's Hospital, where the lacerations to her hands were sutured. Thereafter, she was taken to the police station, where she provided a signed statement.[6]

---

[5] Kaur described the length of the blade as running from the top of her fingers to her wrist.

[6] Kaur gave her statement in English without the assistance of an interpreter.

On May 14, 2009, a robbery occurred at the Overstock Outlet (outlet store) on Wolcott Street in Waterbury, where Marlyn DeJesus was working alone. The outlet store sold clothing and other merchandise. When the defendant entered the store, DeJesus was working near the cash register in the front of the store. She recognized the defendant by sight as a regular customer and greeted him, as she did all customers. The defendant went directly to the rear of the store, and DeJesus returned to what she was doing at the counter.

The defendant removed a number of shirts from a rack and took them to the counter. DeJesus was standing approximately one foot away from the defendant and was able to see his face. DeJesus rang up the cost of the shirts and told the defendant how much he owed. Because the defendant just stared at her, DeJesus repeated the cost of the shirts. She then looked down, saw that the defendant's hands were partially concealed inside his sweatshirt and that he was wearing latex gloves. When the defendant withdrew his hands from his sweatshirt, he was holding a knife in his right hand. He grabbed DeJesus with his left hand, placed the knife at her neck and ordered her to open the cash register, which she did. The defendant removed cash from the drawer and asked DeJesus where the rest of the money was. DeJesus told him there was no more money. The defendant threw DeJesus to the floor, held the knife at the back of her neck and told her not to move or he would kill her. As he fled, the defendant took DeJesus' purse. After she heard the door chimes ring, indicating that the defendant had left the outlet store, DeJesus called 911 and locked the door. Two police officers arrived at the store. Although she initially was very upset, DeJesus calmed down while the police transported her to the station, where she provided a written statement.

On May 16, 2009, the defendant was apprehended at his residence on Garden Circle in Waterbury, which is located halfway between the liquor store and the outlet store. The defendant was charged in separate informations, in connection with the robberies previously described, with one count in each of robbery in the first degree in violation of § 53a-134 and unlawful restraint in the first degree in violation of § 53a-95 (a).[7] After the state presented its case, the defendant moved orally for judgments of acquittal. The court, *Crawford, J.,* denied the motion. After the court accepted the jury's verdicts of guilty on all four charges, which were returned on July 26, 2010, the defendant filed a motion for reconsideration of his motion to strike testimony related to his need for eyeglasses and a motion for a new trial, which were denied by the court at the time of sentencing. The defendant received a total effective sentence of twenty-five years in the custody of the Commissioner of Correction and thereafter appealed.

## I

## EVIDENTIARY CLAIMS

The defendant's theory of defense was misidentification. On appeal, he claims that the court abused its discretion by (1) precluding expert testimony regarding the factors that affect the reliability of eyewitness identification and (2) permitting an optometrist to testify about the defendant's need to wear eyeglasses. We reject both of the defendant's evidentiary claims.

## A

## Evidentiary Facts

Before addressing the defendant's specific claims, we set forth the procedural history and evidence regarding

---

[7] The defendant was charged in part B informations with being a persistent dangerous felony offender in violation of § 53a-40 (a). The charges were tried to the jury, which found the defendant guilty.

the victims' identifications of the defendant as the individual who robbed the liquor and outlet stores. The defendant vigorously challenged much of the state's identification evidence. In doing so, he also sought to present testimony regarding various factors that affect the reliability of eyewitness identification.

During the state's case, the jury heard a recording of Kaur's 911 call in which she stated that the robber had a white beard. Adam Laird was the first Waterbury police officer to arrive in response to the 911 call. Kaur told Laird that the robber was a thin black man who was wearing a gray sweatshirt, a black skullcap and large, metal eyeglasses. After Kaur was transported to Saint Mary's Hospital for medical treatment, her daughter, Nambnee Kaur, came to the liquor store and provided Brian Juengst, a crime scene technician, with access to the store's twenty-four-hour-a-day surveillance video. Moving and still images from the surveillance video were shown to the jury, and Kaur testified that they depicted accurately how the robbery took place.

The day following the robbery, Orlando Rivera, a Waterbury police detective, went to the liquor store and presented a photographic array, which included a photograph of the defendant, to Kaur. According to Rivera, Kaur was scared and did not necessarily want to look at the photographs. She did not make an identification from the photographic array, and she did not identify the defendant as the robber at trial when asked by the assistant state's attorney whether she saw the robber in the courtroom.[8]

At trial, Kaur testified that the robber was black, but she could not remember what he was wearing, other

---

[8] During her final argument, the assistant state's attorney asked the jury to consider Kaur's demeanor when she responded to the inquiry in that Kaur refused to look around the courtroom, particularly in one direction.

than a hood. She also testified that she is five feet, three inches tall and that the robber was "very little" taller than she. The state moved orally that a portion of Kaur's statement to the police describing the robber be admitted pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86 (prior inconsistent statement admissible), cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The court granted the *Whelan* motion, and the following redacted portion of Kaur's statement was published to the jury: "[the robber was] maybe 50 years old . . . he had a little beard, and a dark colored hoodie. I think he was about [five feet, five inches] and he was a little heavy."

Rivera testified that he took a written statement from DeJesus. DeJesus described the robber as having a goatee, being five feet, six inches to five feet, eight inches tall, black, older and wearing a hoodie. She testified that the robber had a large knife. Rivera presented DeJesus with a photographic array, which he had not compiled. Prior to presenting her with the array, Rivera gave DeJesus written instructions, which informed her that the suspect may or may not be in the array. DeJesus signed the form. According to Rivera, DeJesus glanced at the photographs and immediately identified the photograph of the defendant as that of the robber. Rivera did not question her as to her certainty. He also did not inform her that the man in the photograph she had selected depicted the man the police suspect, but he did tell her the man's name and birth date.

At trial, DeJesus testified that she recognized the robber as a regular customer when he entered the outlet store. She described the robber as black, older, maybe in his late forties, short, scruffy looking, having a gray beard and wearing a black ski hat and a black hoodie. Given his appearance, she thought that the robber might be related to someone with whom she had gone to high

school because he was short, had an overbite and a protruding mouth. DeJesus' identification of the defendant as the robber in a photographic array was published to the jury and, when asked whether the robber was in the courtroom, DeJesus identified the defendant. On cross-examination, DeJesus testified that, during the robbery, the defendant was wearing a ski hat and "big glasses . . . ." Defense counsel elicited testimony on cross-examination that DeJesus did not mention the robber's eyeglasses in her signed statement.

There was a surveillance system in the outlet store, too, and the police obtained a copy of the robbery video. Still and moving images from the surveillance video were shown to the jury. DeJesus testified that the surveillance video accurately depicted the way in which the robbery occurred.

The jury saw a photograph of the defendant taken on May 19, 2009, five days after the second robbery. The photograph depicted the defendant with a thin, gray goatee. Writing adjacent to the photograph states the defendant's birth date, September 11, 1958, his height, five feet, five inches, and his weight, 130 pounds. Three more photographs of the defendant taken on May 19, 2009, depicting his face from the front, right and left also were put in evidence. Those images also depict the defendant with a white or gray goatee.

With regard to the defendant's second evidentiary claim, James Smyth, an optometrist with the department, testified with regard to the defendant's vision and need for eyeglasses. According to Smyth, he or one of his associates had examined the defendant's eyes five times between 2004 and 2009. Smyth first examined the defendant's eyes in 2004, and again in 2007 and in November, 2009. He prescribed bifocals for the defendant to enable him to see near and far. According to Smyth, there were minimal changes in the defendant's

vision between 2007 and 2009. During that period of time, according to Smyth, the defendant needed to wear prescription eyeglasses all the time.

## B

### Standard of Evidentiary Review

The standard of review of evidentiary claims is well known. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Popeleski*, 291 Conn. 769, 774, 970 A.2d 108 (2009). In a criminal case, an improper evidentiary ruling by the trial court is harmless if the reviewing court has a fair assurance that the error did not substantially affect the jury's verdict. *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 454 n.23, 953 A.2d 45 (2008) (en banc).

## C

### Defendant's Claim Regarding Expert Testimony

The defendant claims that the court abused its discretion by precluding him from presenting expert testimony from Steven Penrod, a psychologist, regard-

ing the reliability of eyewitness identification.[9] We disagree.[10]

The following additional facts are relevant to our resolution of the defendant's claim. After the jury had been selected, but before the presentation of evidence began, the court held a hearing on the defendant's motion to suppress DeJesus' identification of the defendant in the photographic array. The defendant claimed in his motion that the procedure used by the police officers in obtaining the photographic identification was unduly suggestive and that the resulting identification was unreliable under the totality of the circumstances. The court, however, found that the procedure used in presenting the photographic array to DeJesus was not unnecessarily suggestive and that the identification was not unreliable under all of the circumstances.

---

[9] Although the defendant states his claim as an alleged abuse of discretion, at several places in his brief, he invokes his constitutional right to present a defense. To the extent that the defendant is now claiming that he was prevented from presenting a defense, we decline to review such a claim. At trial, the defendant represented that the court's decision whether to admit Penrod's testimony was discretionary. This court does not review claims not raised at trial; see *State* v. *Evans*, 165 Conn. 61, 69, 327 A.2d 576 (1973); and the defendant has not requested review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We therefore do not address any claims or arguments of a constitutional nature arising from the preclusion of Penrod's expert testimony. Moreover, in *Guilbert*, our Supreme Court stated that the trial court retains "broad discretion in ruling on the qualifications of expert witnesses and determining whether their opinions are relevant." *State* v. *Guilbert*, supra, 306 Conn. 257. Discretion pertains to evidentiary, not constitutional, rulings. See *State* v. *Popeleski*, supra, 291 Conn. 774.

[10] In resolving the defendant's claim regarding expert testimony, we are aware that the law has evolved since the court precluded Penrod from providing expert testimony on eyewitness identification. See *State* v. *Guilbert*, supra, 306 Conn. 218; *State* v. *Outing*, 298 Conn. 34, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). Although the case law on which the court relied is no longer sound; see footnote 1 of this opinion; on the basis of the record and the evidence in this case, we conclude that the court did not abuse its discretion by granting the state's motion to preclude Penrod's expert testimony. "We can sustain a right decision although it may have been placed on a wrong ground." *Stapleton* v. *Lombardo*, 151 Conn. 414, 417, 198 A.2d 697 (1964).

To the contrary, the court found that DeJesus' identification of the defendant as the robber was reliable because she identified the defendant immediately, she recognized the defendant as a regular customer of the outlet store, there was "absolutely no prompting" by anyone and Rivera provided DeJesus with instructions pursuant to *State* v. *Ledbetter*, 275 Conn. 534, 579–80, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

During jury selection, the defendant informed the venire panel that he intended to call an expert witness to testify with respect to the reliability of eyewitness identification in general. The state filed a motion to preclude such expert testimony, arguing that the testimony should be precluded for three reasons: (1) the testimony fails to meet the standards of relevance and reliability established in *State* v. *Porter*, supra, 241 Conn. 64, (2) the testimony invades the province of the jury to determine what weight to give to identifications and (3) the testimony would not assist the finder of fact as required by the § 7-2 of the Connecticut Code of Evidence.[11]

The defendant opposed the state's motion to preclude expert testimony, arguing that there was no need for a *Porter* hearing because the factors were well established and that controlling case law, *Velasco* v. *Commissioner of Correction*, 119 Conn. App. 164, 173 n.4, 987 A.2d 1031, cert. denied, 297 Conn. 901, 994 A.2d 1289 (2010), did not prohibit the admission of expert testimony on eyewitness identification but left it to the

---

[11] In opposing Penrod's testimony, the state did not challenge Penrod's qualifications, but relied, in part, on *State* v. *McClendon*, 248 Conn. 572, 730 A.2d 1107 (1999), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012), and *State* v. *Kemp*, 199 Conn. 473, 507 A.2d 1387 (1986), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012), to the extent that *McClendon* and *Kemp* stood for the proposition that the factors affecting eyewitness identification are within the common knowledge of the average person. But see footnote 1 of this opinion.

court's discretion. The court informed defense counsel that he had not disclosed the opinions and substance of the expert witness testimony. Defense counsel indicated that the expert would testify about the factors that affect the reliability of eyewitness identification, but the expert had not prepared any reports or done any experiments in connection with this case. The court was not satisfied with the extent of counsel's proffer and ordered defense counsel to provide it and the state with the substance of the proffered expert's testimony.[12]

The defendant filed an offer of proof regarding Penrod's testimony on memory and the accuracy of eyewitness identification. The written proffer included a listing of Penrod's credentials and a description of his testimony regarding how memory works, specifically, that memory is divided into three stages—acquisition, retention and retrieval—and how an eyewitness' memory is affected at each stage. The proffer contained nothing specific to the eyewitness identifications at issue in this case. At the court's request, the defendant filed a supplemental offer of proof[13] identifying factors

[12] The court stated: "I am ordering you to provide to the court the following: If you intend to call an expert concerning eyewitness identification, in light of the fact that the state has filed an objection to that, I need to know the substance of the identification . . . at this point to show that it's unreliable. I need some authority on it because I don't know at this point if this is a situation where there even needs to be a preliminary hearing, because I don't even know what the substance is, and neither does the state. So, I don't know if this is something that requires a *Porter* hearing because of the limited information that has been provided so far."

[13] In his supplemental written offer of proof, the defendant noted that DeJesus recognized the robber as a person who had been in the outlet store previously and that *unconscious transference* is known to taint a subsequent identification. The defendant included the unconscious transference factor in his written proffer of proof, but did not present an argument and facts regarding it to the court. At the conclusion of defense counsel's argument regarding the factors, the court asked counsel if there was anything more. Counsel answered in the negative. In ruling on the state's motion to preclude Penrod's testimony, the court made no findings with regard to, and did not mention, the unconscious transference factor. The record therefore is inadequate for us to consider the defendant's claim regarding this factor on appeal.

that affect memory in the acquisition, retention and retrieval stages and generally correlating those factors to the evidence in this case.[14] Defense counsel represented that factors affecting memory include the robber's wearing of accessories such as a hat and eyeglasses, which act to *disguise* the robber's face. They also include *stress*, which adversely affects a person's ability to process information and undermines the reliability of a subsequent identification. DeJesus, he noted, was under stress both during and immediately after the robbery. A third factor affecting memory is the presence of a *weapon*, here, a knife, which attracts the attention of a witness away from the perpetrator's face. A fourth factor is the duration of the witness' observation of the perpetrator. A robbery of relatively short duration (*exposure*), during which a witness is only able to see the robber's face for an abbreviated period of time, generally leads to less reliable identifications than longer robberies featuring more extended periods of observation. Fifth, *cross-racial identifications* are less reliable than observations of persons of the same race as the witness. Defense counsel claimed that DeJesus is Hispanic and the defendant is black.[15] Sixth, during the retrieval stage of memory, the manner in which a photographic array is presented to an eyewitness affects the suggestiveness of the array.

With respect to DeJesus' identification of the defendant in the photographic array, defense counsel proffered that Penrod would testify that a simultaneous

---

[14] At oral argument on the motion to preclude expert testimony, the defendant stated that Penrod's testimony would pertain to DeJesus, not Kaur, as DeJesus was the only witness who made an identification.

[15] Defense counsel argued that DeJesus was Hispanic, given her name and skin tone, and that she clearly was not black. The court questioned whether being Hispanic is a race or an ethnic identity. The court found that there was no foundation for it to consider the cross-racial identification factor. DeJesus' race was not placed into evidence. We agree with the court that there is no evidence of DeJesus' race and that the sound of one's name and tone or color of one's skin is not necessarily evidence of one's race.

photographic array is less likely to result in an accurate identification than a sequential photographic array.[16] Moreover, counsel stated that Penrod would testify that the photographic array in this case was suggestive because the defendant was the only man dressed in a white shirt that bore words and the level of his head in his photograph was higher than the level of those of the others in the array in their respective photographs. The defendant finally argued that to the extent that the administration of the photographic array was not "blind," DeJesus' identification was less reliable than identifications resulting from procedures administered by a "blind" administrator, i.e., people not familiar with the suspect.[17]

The state's opposition to Penrod's testimony was grounded in § 7-2 of the Connecticut Code of Evidence.[18] The state argued that DeJesus knew the robber as a regular customer of the outlet store, and therefore that the testimony would not help the jury. The state relied on *State* v. *Manson*, 118 Conn. App. 538, 547, 549, 984 A.2d 1099 (2009), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010), for the proposition that, where the victim knows the perpetrator, expert testimony is irrelevant, and cases stating that the identification factors were

---

[16] In a simultaneous array, all of the photographs are shown to the witness at one time. In a sequential array, the photographs are shown to the witness one at a time.

[17] Throughout his argument opposing the state's motion to preclude, defense counsel identified factors that affect the reliability of eyewitness identification and the evidence in this case. The court *repeatedly* asked defense counsel whether there were other factors to consider. Defense counsel never mentioned unconscious transference or evidence related thereto.

[18] Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

well known to the average person and that it is common knowledge that many of the identification factors about which Penrod would testify affect reliability.[19] In addition, the state argued that the hat and eyeglasses the robber was wearing were not a disguise and that none of the men in the photographic array was wearing a hat or eyeglasses. Finally, the state claimed that there was no foundation to consider the factor of cross-racial identification because there was no evidence of DeJesus' race.

As to the photographic array Rivera showed to DeJesus, the state argued that there was no evidence that Rivera had coached the identification. Moreover, DeJesus knew the robber, having seen him in the outlet store before. The state argued that although the array in this case was a simultaneous array, Penrod should not be permitted to testify as to what he may think is a better procedure because that is not the issue before the jury. The state contended that no expert was needed to point out differences between the images in the photographic array because the jurors could see the differences for themselves. The state added that in *State* v. *Marquez*, 291 Conn. 122, 155, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009), our Supreme Court noted that the scientific research regarding whether sequential or simultaneous arrays result in more accurate identifications is in a state of flux.[20]

---

[19] In asserting its argument, the state relied on *State* v. *Kemp*, 199 Conn. 473, 477, 507 A.2d 1387 (1986) (expert testimony regarding reliability of eyewitness identification within knowledge of jurors; expert testimony on subject invades province of jury to determine weight of evidence), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012); *State* v. *McClendon*, 248 Conn. 572, 589, 730 A.2d 1107 (1999) (same), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012), which, at the time, were the law in Connecticut. But see footnote 1 of this opinion.

[20] See *State* v. *Artis*, 136 Conn. App. 568, 626 n.7, 47 A.3d 419 (*Lavine, J.*, concurring in part and dissenting in part) ("Eyewitness Identification Task Force, state of Connecticut, Report Pursuant to Public Act 11-252, § 2 [February 8, 2012] available at http://www.cga.ct.gov/jud/eyewitness/docs/

Here, the trial court issued its ruling orally, first identifying the issue as whether Penrod should be allowed to provide expert testimony concerning the reliability of the eyewitness identification and the nature of DeJesus' identification in this case. The court noted with regard to the nature of the photographic array that the test is not a best practices test and that some of Penrod's proffered testimony would address presumed better practices. As to the proffered testimony, the court stated that the relevant test is not one of best practices or which method is preferable, but whether the array presented to DeJesus was unnecessarily suggestive, citing *State* v. *Marquez*, supra, 291 Conn. 145. "An identification procedure is unnecessarily suggestive *only* if it gives rise to a *very substantial* likelihood of irreparable misidentification." (Emphasis in original; internal quotation marks omitted.) Id., 139.

The court found that proffered factors affecting DeJesus' identification and the photographic array did not constitute scientific or expert testimony that would assist the jury.[21] Moreover, the surveillance video and

Final%20Report.pdf [last visited February 21, 2012] [recommending mandatory sequential rather than simultaneous presentation of photographic arrays using double-blind procedure or, if not practicable, blind procedure]; Substitute House Bill No. 5501, February Sess. 2012 [adopting recommendations of eyewitness identification task force]; Report on Bills Favorably Reported by Committee, Judiciary, House Bill No. 5501 [April 5, 2012]."), cert. granted on other grounds, 307 Conn. 909, 53 A.3d 999 (2012).

In this opinion, we are not called on to decide whether a simultaneous or sequential photographic array is a more reliable method of identification.

[21] The court ruled from the bench in granting the state's motion to preclude expert testimony, stating in relevant part: "The defendant proffered the testimony of Dr. Penrod as an expert concerning the reliability . . . of eyewitness identification. Included in the proffer[ed] testimony [were] the following facts that the accused in the testimony indicates —and the videotape—basically, the evidence presented that the expert would be relying on, in terms of the proffered testimony, as the accused was wearing a hat and gloves and such obscures the head and face; that the person accused was different in the photo array than on the day of the incident, appeared different; that there was focus on the knife, and there was extensive questioning concerning the knife; that the stress of the incident, and there was

DeJesus' testimony were before the jury to be weighed. As to the cross-racial identification factor, the court found that an inadequate foundation had been laid as to whether DeJesus and the defendant were of different races or of different ethnic backgrounds.[22] The court did not permit Penrod to testify.[23]

---

testimony to that effect. The issue of cross-racial identification. The length of time of the crime and the length of time that the witness had to observe the accused. The type of photo array. And whether—and the fact that the officer knew the suspect and may have subconsciously made suggestions as to the suspect. And, again on the array, whether it was a simultaneous—the fact that it was a simultaneous array. . . .

"The state moved to [preclude] the testimony and in support cited Connecticut Code of Evidence § 7-2 and also a number of cases. The issue, then, is the identity of the person who committed the robbery, and the testimony proffered goes to the facts and factors mentioned and how they would affect the reliability of the identification. . . .

"The factors, as listed by the defense, excluding the cross-racial identification and the photo array, do not constitute scientific or expert testimony of such that would assist the jury in this matter. There is *the video of the incident, there is testimony,* and the jurors can weigh that evidence and determine what weight to give to the identification." (Emphasis added.)

Immediately following the court's ruling, defense counsel again presented an argument regarding cross-racial identification, but no other factor.

[22] The court noted that the woman in the outlet store had a Hispanic sounding last name, but that it could not conclude from a Hispanic sounding last name that the parties are of different races or even different ethnic backgrounds.

The next day the defendant filed a motion for reconsideration arguing that there was evidence of DeJesus' race, given her appearance. The court found that no evidence was presented to support the argument. The motion for reconsideration also addressed the method of presenting a photographic array. The court again stated that it previously had found that the array was not unnecessarily suggestive. The court denied the motion for reconsideration.

[23] At the conclusion of evidence, during his final argument to the jury, defense counsel focused on evidence relevant to the factors that he contended undermined the reliability of DeJesus' identification. In *Guilbert,* however, our Supreme Court stated that closing argument by defense counsel to the jury that "an eyewitness identification is unreliable . . . is an inadequate substitute for expert testimony. In the absence of evidentiary support, such an argument is likely to be viewed as little more than partisan rhetoric." *State* v. *Guilbert,* supra, 306 Conn. 244.

In its charge, the trial court here included extensive instructions on the factors identified as affecting the reliability of eyewitness identification.

In resolving the defendant's claim, we are guided by the well-known standard of review. "Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Borrelli*, 227 Conn. 153, 165, 629 A.2d 1105 (1993). "Implicit in this standard is the requirement . . . that the expert's knowledge or experience must be directly applicable to the matter specifically in issue." (Internal quotation marks omitted.) *State* v. *Banks*, 117 Conn. App. 102, 116, 978 A.2d 519, cert. denied, 294 Conn. 905, 982 A.2d 1081 (2009). The "proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract." (Internal quotation marks omitted.) *State* v. *Griffin*, 273 Conn. 266, 275–76, 869 A.2d 640 (2005).

With respect to the preclusion of expert testimony, "[w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . A nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Snelgrove*, 288 Conn. 742, 758, 954 A.2d 165 (2008).

Although our Supreme Court stated, however, that "jury instructions that direct jurors in broad terms to exercise caution in evaluating eyewitness identifications are less effective than expert testimony in apprising the jury of the potential unreliability of eyewitness identification testimony"; id., 245; it found that the detailed instructions provided by the trial court in *Guilbert*, which were similar to the instructions the court gave in this case, provided some modest assistance to the jury. Id., 266.

*State* v. *Guilbert*, supra, 306 Conn. 218, is now the law that controls the defendant's claim regarding the court's ruling granting the state's motion to preclude Penrod's testimony. "[T]he reliability of eyewitness identifications frequently is not a matter within the knowledge of an average juror and . . . the admission of expert testimony on the issue does not invade the province of the jury to determine what weight to give the evidence. Many factors affecting the reliability of eyewitness identifications are either unknown to the average juror or contrary to common assumptions, and expert testimony is an effective way to educate jurors about the risks of misidentification." (Footnote omitted.) Id., 251–52.

"The extensive and comprehensive scientific research . . . convincingly demonstrates the fallibility of eyewitness identification testimony and pinpoints an array of variables that are most likely to lead to a mistaken identification. [T]he scientific evidence . . . is both reliable and useful." (Footnotes omitted; internal quotation marks omitted.) Id., 235–36. "[T]he science abundantly demonstrates the many vagaries of memory encoding, storage and retrieval; the malleability of memory; the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and the many other facts that bear on the reliability of eyewitness identifications." (Internal quotation marks omitted.) Id., 237.

"[E]xpert testimony on the reliability of eyewitness identifications does not [invade] the province of the jury to determine what weight or effect it wishes to give to eyewitness testimony. . . . An expert should not be permitted to give an opinion about the credibility or accuracy of the eyewitness testimony itself; that determination is solely within the province of the jury. Rather, the expert should be permitted to testify only about factors that generally have an adverse effect on

the reliability of the eyewitness identifications and are relevant to the specific eyewitness identification at issue." (Citation omitted; internal quotation marks omitted.) Id., 246–48.

"In light of the numerous scientifically valid studies cited [in *Guilbert*] . . . as a general matter, competent expert testimony predicated on those studies' findings satisfies the threshold admissibility requirement of *State* v. *Porter*, supra, 241 Conn. 57, that such testimony must be based on scientific knowledge rooted in the methods and procedures of science . . . at least with respect to the following propositions: (1) there is at best a weak correlation between a witness' confidence in his or her identification and the identification's accuracy; (2) the reliability of an identification can be diminished by a witness' focus on a weapon; (3) high stress at the time of observation may render a witness less able to retain an accurate perception and memory of the observed events; (4) cross-racial identifications are considerably less accurate than identifications involving same races; (5) memory diminishes most rapidly in the hours immediately following an event and less dramatically in the days and weeks thereafter; (6) an identification may be less reliable in the absence of a double-blind, sequential identification procedure; (7) witnesses may develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification; and (8) the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another." (Citation omitted; internal quotation marks omitted.) *State* v. *Guilbert*, supra, 306 Conn. 253–54.

A trial court, however, "retains broad discretion in ruling on the qualifications of expert witnesses and determining whether their opinions are relevant. See,

e.g., *State* v. *Beavers*, 290 Conn. 386, 414, 963 A.2d 956 (2009). Consequently, whether to permit expert testimony concerning the reliability of eyewitness identification evidence in any individual case ultimately is a matter within the sound discretion of the trial court. A trial court may bar expert testimony on the fallibility of eyewitness identifications if it reasonably concludes that the witness does not qualify as an expert or . . . lacks an adequate scientific foundation for one or more of his opinions concerning the eyewitness identification at issue. Similarly, the trial court may preclude such testimony if the court reasonably determines, upon due consideration of the facts and circumstances of the case, that the particular issue presented is not beyond the ken of the average juror or that the proffered testimony would not aid the jury in resolving the issues presented. In other words, although we overrule our prior case law holding that expert testimony on eyewitness identification is generally inadmissible, such evidence is subject to the same threshold reliability and relevance requirements as any other expert testimony." *State* v. *Guilbert*, supra, 306 Conn. 257.

The defendant claims that the court abused its discretion in granting the state's motion to preclude Penrod from testifying. At the time the court issued its ruling, it stated that it had reviewed the cases cited by the parties[24] and the factors relevant to eyewitness identification, with the exception of cross-racial identification and the methods of presenting a photographic array. The court concluded that the proffered expert testimony would not assist the jury, which is the test pursuant to our code of evidence, § 7-2. In this court, the

[24] The court identified *State* v. *Marquez*, supra, 291 Conn. 122, *State* v. *McClendon*, 248 Conn. 572, 730 A.2d 1107 (1999), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012), and *State* v. *Kemp*, 199 Conn. 473, 507 A.2d 1387 (1986), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012); but see footnote 1 of this opinion; *Velasco* v. *Commissioner of Correction*, supra, 119 Conn. App. 164.

defendant has argued that the basis of the trial court's granting of the state's motion to preclude Penrod's testimony was founded on outdated reasoning that was criticized by our Supreme Court in *State* v. *Outing*, 298 Conn. 34, 58, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). On the basis of our review of the record in this case and *State* v. *Guilbert*, supra, 306 Conn. 218, we reject the defendant's argument.

Although the court granted the motion to preclude Penrod's testimony on grounds that are inconsistent, in part, with *State* v. *Guilbert*, supra, 306 Conn. 218, *Guilbert* holds that the trial court retains discretion to preclude such expert testimony on the basis of the facts and circumstances of a particular case. Id., 257. In ruling on the state's motion to preclude Penrod's testimony, the court addressed the evidence before the jury and some, but not all, of the identification factors listed in *Guilbert*.[25] We need not address those factors to resolve the defendant's claim on appeal.

Our Supreme Court has stated that "[i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion. . . .

---

[25] The court found that there was no evidentiary basis to consider the cross-racial identification factor and that its ruling on the defendant's motion to suppress determined that DeJesus' identification was not unnecessarily suggestive. The court made no mention of the unconscious transference factor. In his main brief on appeal, the defendant addressed the applicability of *State* v. *Outing*, supra, 298 Conn. 34, to this case. He did not address the factors affecting the reliability of eyewitness identification specifically related to the evidence in this case. In his reply brief, the defendant enumerated each of the factors in a generalized manner. We take this opportunity to remind all counsel that new arguments are not to be raised in a reply brief because it precludes the opposing party from responding. See *State* v. *Rosario*, 113 Conn. App. 79, 93, 966 A.2d 249, cert. denied, 291 Conn. 912, 969 A.2d 176 (2009).

Despite this deferential standard, the trial court's discretion is not absolute. . . . Thus, [i]n reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Citations omitted; internal quotation marks omitted.) *State* v. *Jacobson*, 283 Conn. 618, 626–27, 930 A.2d 628 (2007).

We conclude that the court did not abuse its discretion by precluding Penrod's testimony regarding eyewitness identification. In issuing its ruling, the court stated, in part: "The factors, as listed by the defense, excluding the cross-racial identification and the photo array, do not constitute scientific or expert testimony of such that would assist the jury in this matter. There is the video of the incident, there is testimony, and the jurors can weigh that evidence and determine what weight to give to the identification." The defendant has not challenged the testimony or surveillance or photographic evidence on appeal.

Our code of evidence provides that a qualified expert may testify concerning scientific evidence "if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue." Conn. Code Evid. § 7-2. On the basis of our review of the defendant's proffer of Penrod's testimony and the evidence, we conclude that the defendant failed to lay an adequate foundation with respect to the cross-racial identification factor. We further conclude that the evidence does not support a need for expert testimony regarding DeJesus' identification of the defendant as the person who robbed the outlet store. Although we do not agree

fully with the reasoning of the trial court in precluding Penrod's proffered expert testimony, we conclude that the court did not abuse its discretion in precluding it.[26]

DeJesus testified that she knew the defendant because he was a regular customer in the outlet store. She recognized him when he entered the outlet store. "[T]he accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another." *State* v. *Guilbert*, supra, 306 Conn. 239. In *Guilbert*, our Supreme Court concluded that a witness' familiarity with the perpetrator of a crime was sufficient reason to preclude expert testimony with respect to eyewitness identification. Id., 261 . The facts concerning one of the witnesses in *Guilbert* are similar to the facts concerning DeJesus' identification of the defendant in this case.

"[A]lthough there are exceptions, identification of a person who is well-known to the eyewitness generally does not give rise to the same risk of misidentification as does the identification of a person who is not well-known to the eyewitness." Id., 259–60. "The primary concern expressed in cases discussing the problems with eyewitness identification relates to a witness observing and subsequently identifying a stranger. . . . Witnesses are very likely to recognize under any circumstance the people in their lives with whom they are most familiar, and any prior acquaintance with another person substantially increases the likelihood of an accurate identification." (Internal quotation marks omitted.) Id., 260 n.39, quoting *Haliym* v. *Mitchell*, 492 F.3d 680, 706 (6th Cir. 2007).

*Guilbert* concerned the identification of the person responsible for two murders and an assault in the first

---

[26] "We can sustain a right decision although it may have been placed on a wrong ground." *Stapleton* v. *Lombardo*, 151 Conn. 414, 417, 198 A.2d 697 (1964).

degree that occurred in New London on October 9, 2004. *State* v. *Guilbert*, supra, 306 Conn. 222. "Lashon Baldwin saw the defendant's photograph in a newspaper and gave a statement to the New London police about the incident at the intersection of Hope and Hempstead Streets. At trial, Baldwin testified to the following. At the time of the shooting, Baldwin and her cousin . . . were seated in a car parked on Hempstead Street. Baldwin saw a car traveling down Hempstead Street and, as the car reached Hope Street, she heard three 'loud pops.' The car then came to a stop after hitting another parked car, and the defendant exited through the back door on the driver's side. . . . Baldwin recognized the defendant and knew him as 'Fats' because she had seen him as a 'regular customer' in a donut shop where she had worked for more than one and one-half years." Id., 223. Our Supreme Court concluded in *Guilbert* that there was no abuse of discretion in precluding expert testimony with respect to Baldwin because Baldwin was one of four eyewitnesses "familiar enough with the defendant that the risk of misidentification was small." Id., 261.

In this case, although DeJesus did not know the defendant's name, she testified that she recognized him as a regular customer of the outlet store that was robbed. Although DeJesus put no time frame on the period in which she had come to be familiar with the defendant, she expressly claimed familiarity with him as a regular customer where she had opportunity to see him on multiple occasions before the robbery. We conclude, on the basis of the facts of this case and their similarity to those concerning Baldwin in *Guilbert*, that the risk of misidentification was small. The court therefore did not abuse its discretion in precluding Penrod's proffered expert testimony.

## D

## Testimony from Department Optometrist

The defendant's second evidentiary claim is that the court abused its discretion by permitting Smyth, the optometrist with the department, to testify about the defendant's need to wear eyeglasses. We do not agree, as the court found that Smyth's testimony was relevant to the misidentification issue raised by the defendant.

Within the defendant's abuse of discretion claim, he claims that the state illegally procured Smyth's testimony by issuing a subpoena to obtain his records from the department, which he further contends violated his rights under the Health Insurance Portability and Accountability Act of 1996 (HIPAA)[27] and the fourth and fourteenth amendments to the United States constitution by disclosing the records.[28] The defendant's privacy contentions, however, raise a question of law, and are separate from the defendant's evidentiary claim.[29]

The following procedural history is relevant to the defendant's claim. At the time of trial, the defendant provided a witness list identifying witnesses who would testify that he did not wear eyeglasses.[30] To counter

---

[27] See Pub. L. No. 104-191, 110 Stat. 1936 (1996).

[28] In his brief, the defendant also argues that his right to due process under the fourteenth amendment was violated when the court permitted Smyth to testify. We decline to review this claim, as it is inadequately briefed. See *State* v. *Koslik*, 137 Conn. App. 855, 858 n.7, 49 A.3d 1067, cert. denied, 307 Conn. 926, 55 A.3d 568 (2012).

[29] In his reply brief, the defendant claims that the "core issue before this court is whether the state obtained the defendant's medical records in violation of the Fourth Amendment, and if so, what is the proper remedy when the state illegally obtains medical records in a criminal prosecution?" This is not the claim raised in his main brief, which is that the court abused its discretion by permitting Smyth to testify. We do not address claims raised for the first time in a reply brief. See *State* v. *Rosario*, 113 Conn. App. 79, 93, 966 A.2d 249, cert. denied, 291 Conn. 912, 969 A.2d 176 (2009).

[30] The record makes no mention of whether the defendant wore eyeglasses during the trial. In its brief, however, the state represented that the defendant did not wear eyeglasses when the jury was present in the courtroom.

the anticipated testimony, the state sought information concerning the defendant's need for eyeglasses by issuing a subpoena to obtain the defendant's optometry records (records) from the department.[31] Instead of appearing in court with the defendant's records, as the subpoena instructed, the department faxed them to the office of the state's attorney. The state learned when it received the records that Smyth had examined the defendant's eyes. The assistant state's attorney has represented that she provided defense counsel with a copy of the records.

After Kaur testified, the state sought to introduce the records through Smyth. The defendant objected, and the court sustained the objection on relevancy grounds, but without prejudice. After the jury viewed the still and moving surveillance images of the robberies, which depicted the robber wearing large eyeglasses, the state renewed its efforts to present Smyth's testimony. The defendant objected again, and the court again sustained the objection, but without prejudice.

When defense counsel cross-examined DeJesus, he challenged her description of the robber by noting that her signed statement failed to mention that the robber wore eyeglasses. At the conclusion of DeJesus' testimony, the court sua sponte revisited its decision concerning Smyth's testimony because defense counsel had questioned DeJesus about the robber's eyeglasses. The defendant objected on two grounds: because he had never signed a release permitting the state to obtain his

---

[31] The subpoena was issued to Warden Jon Brighthaupt of the New Haven Correctional Center. It stated in relevant part: "By the authority of the state . . . you are hereby commanded to appear before the above court in criminal session at the above address on the date indicated above . . . on which the above-entitled case is legally to be tried, to testify what you know in said case . . . . You are further commanded to bring with you and Produce . . . any and all [department] optometry information, including vision and any eyeglass prescription information for . . . Williams, Stanley—date of birth 09/11/1968 . . . ."

optometry records, the state had obtained his records in violation of (1) HIPAA and (2) the fourth and fourteenth amendments to the United States constitution. Defense counsel argued that the state illegally issued a subpoena to the department rather than securing a search warrant to obtain the records in which the defendant had a reasonable expectation of privacy. The state argued that HIPAA permits medical records to be subpoenaed as evidence in criminal trials and that the statute may not be used as a shield to prevent the state from presenting relevant evidence. The court overruled the defendant's objection, finding that he had not filed a motion to quash the state's subpoena.

Smyth testified that the defendant needed to wear bifocals at all times, but the defendant's records were not put into evidence. The next day, the defendant filed a motion to strike Smyth's testimony, claiming that his records had been obtained illegally under the fourth, fifth and fourteenth amendments to the United States constitution, article first, § 8, of the constitution of Connecticut and HIPAA.[32] The court denied the motion to strike, again noting that procedurally, the defendant had never filed a motion to quash the subpoena.[33]

With regard to the defendant's claim that the state illegally issued the subpoena, General Statutes § 52-143

[32] The defendant's motion to strike Smyth's testimony is brief and lacking in analysis. Although it contends that the defendant's HIPAA and fourth amendment rights were violated, it does not substantively address the fifth and fourteenth amendments to the federal constitution or the state constitution.

[33] In denying the motion to strike Smyth's testimony, the court also stated: "If there's a separate issue concerning the record, then that may have to be taken up in a different forum, but, also, again, as to the initial motion and this motion to strike, there is a lot of presumably, I assume, and something might have happened, and information had been presented and this is my gist of it. But when asked for specifically what was said, it was not provided. So, this may very well be an issue, but the issue concerning whether it is a violation would have to be addressed in a different forum. So, that motion is denied."

(a)[34] authorizes a commissioner of the Superior Court to subpoena witnesses; § 52-143 (c) specifically concerns subpoenas served on a correctional officer. It was the defendant's burden to demonstrate that the subpoena was issued illegally, as he claimed.[35] Whether the subpoena was issued illegally is a separate question, however, from whether the disclosure of records the subpoena sought (1) violated his right to privacy under HIPAA or the fourth amendment and (2) were admissible at trial.

"A subpoena is an appropriate process for the production of documents that are relevant to the matter before the court." (Internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 728, 759 A.2d 995 (2000). "If the subpoena on its face is too broad and sweeping, it is subject to a motion to quash." (Internal quotation marks omitted.) Id. In this case, the defendant failed to file a motion to quash. The court therefore had no occasion to rule on the breadth of the subpoena. We do not review claims raised for the first time on appeal.

As to the defendant's claim that his rights under HIPAA were violated by the state when it issued a subpoena to the department, the defendant has not pointed to any finding by the court that the state failed to abide by the HIPAA regulations. The defendant does not argue that the state violated § 52-143, only that that

---

[34] General Statutes § 52-143 (a) provides in relevant part: "Subpoenas for witnesses shall be signed by . . . a commissioner of the Superior Court and shall be served by an officer, indifferent person . . . . The subpoena shall be served not less than eighteen hours prior to the time designated for the person summoned to appear, unless the court orders otherwise."

[35] On appeal, the defendant argues that the state should have sought a search warrant to obtain his records. In support of his argument, the defendant relies on the law regarding the exclusionary rule, noting that the purpose of the rule "is to deter future unlawful police conduct . . . ." (Internal quotation marks omitted.) *Payne* v. *Robinson*, 207 Conn. 565, 570, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988). This case does not involve an illegal search and seizure by police.

statute is not applicable in this situation. He argues that a search warrant was required to obtain his records. Nothing in the HIPAA regulations that the defendant has brought to our attention requires a search warrant to obtain medical records in a criminal prosecution.[36] To the contrary, an entity covered by HIPAA regulations may disclose medical records pursuant to a subpoena if certain conditions are met. See footnote 36 of this opinion. The court made no finding as to whether the conditions had been met, but noted that even if the conditions had not been met, the defendant's relief had to be obtained in a different forum. Because the court made no findings with regard to the circumstances under which the department was permitted to respond to the state's subpoena, the record is inadequate for review.

Turning to the defendant's claim that the state violated his right to privacy under the fourth and fourteenth amendments,[37] this court considered a similar issue in *State* v. *Legrand*, 129 Conn. App. 239, 244, 20 A.3d 52, cert. denied, 302 Conn. 912, 27 A.3d 371 (2011), in which the defendant, David Paul Legrand, claimed that the state's use of a subpoena, rather than a search warrant, to obtain his medical records violated his federal and

---

[36] Section 164.512 (e) of title 42 of the United States Code "authorizes a covered entity . . . to disclose private health information in judicial or administrative proceedings in response to an order of a court. § 164.512 (e) (1) (i). The regulation also allows the disclosure of such information in those proceedings in response to a subpoena, discovery request, or other lawful process, § 164.512 (e) (1) (ii), if the party seeking the information either notifies the patient (or at least makes a good faith effort to do so) . . . ." (Internal quotation marks omitted.) *Northwestern Memorial Hospital* v. *Ashcroft*, 362 F.3d 923, 925 (7th Cir. 2004).

[37] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

state constitutional rights. This court concluded, under those facts, that the state's use of a subpoena met the reasonableness requirement under the fourth amendment. Id., 257. Because the facts of this case are similar to those in *Legrand*, that case controls our decision, although the claim in *Legrand* constituted a claim of law,[38] not an abuse of discretion, as the defendant here claims.

We begin with the facts. Legrand was charged with operating a motor vehicle under the influence of drugs and failing to keep a narcotic drug in its original container. Id., 241–42. The prosecutor expected that Legrand's physician would testify on his behalf and therefore subpoenaed the physician, ordering him to bring Legrand's medical records from " 'January 1, 2007, to August 1, 2008'," to court. Id., 245. The records were delivered to court under seal, and the prosecutor asked that they be unsealed in anticipation of the physician's testimony. Id. Defense counsel indicated that he was unaware of the state's subpoena and refused to consent to the disclosure of the medical records, noting that Legrand "had not waived his right to privacy under . . . federal law . . . ." Id. Defense counsel argued that a warrant was necessary to obtain the medical records. Id., 247. The *Legrand* trial court concluded that the prosecutor had made a sufficient showing to permit the general disclosure of Legrand's medical records from January 1, 2006, to August, 2008. Id.

On appeal, Legrand claimed that "a warrant was required to seize [his] medical records . . . ." Id., 247–48. This court noted certain significant factors, to wit: although Legrand objected to the subpoena, (1) he failed to file a motion to suppress or a motion to quash;

---

[38] Unlike the defendant's abuse of discretion claim here, the claim in *Legrand* was whether "the state's use of a subpoena, rather than a search warrant, violated his federal and state constitutional rights"; *State* v. *Legrand*, supra, 129 Conn. App. 244; which is a question of law.

id., 255 n.14; (2) although the physician complied with the subpoena before notifying Legrand; id., 246; Legrand was given an opportunity to object to the disclosure of the medical records to the prosecutor and (3) Legrand's defense was based on the medical records, which defense he developed during trial. Id., 255–56.

There are similarities between the *Legrand* factors and the facts of this case. The defendant's witness list indicated that he intended to present testimony that he did not need eyeglasses and his theory of defense was misidentification. The defendant did not file a motion to quash the state's subpoena and the department apparently did not communicate with him or the state before faxing the records to the office of the state's attorney. Although the records were disclosed to the office of the state's attorney by facsimile, the court afforded the defendant an opportunity to object to their use at trial and twice sustained the defendant's objection to them, on grounds of relevance, until he questioned DeJesus on cross-examination about whether the robber was wearing eyeglasses. See, e.g., *State* v. *Marshall*, 114 Conn. App. 178, 185, 969 A.2d 202 (defense counsel opened door to previously excluded evidence by eliciting testimony regarding ownership of vehicle), cert. denied, 292 Conn. 911, 973 A.2d 661 (2009).

*Legrand* was decided pursuant to the following legal principles. "The purpose of [the fourth] amendment is to constrain intrusions that are not justified in the circumstances or those made in an improper manner; *it does not protect against all intrusions.* . . . Our Supreme Court has explained that the fourth amendment *protects against the unreasonable seizure of an individual's property.* . . . [T]o state a constitutional violation, the [party claiming such a violation] must allege (1) [the state actor's] conduct constituted a seizure, and (2) the seizure, if one occurred, was unreasonable. . . .

"With regard to the reasonableness requirement . . . the [Supreme] Court has viewed a seizure of personal property as per se unreasonable within the meaning of the [f]ourth [a]mendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized. . . . *The Supreme Court has nonetheless made it clear that there are exceptions to the warrant requirement.* When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [c]ourt has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable."[39] (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Legrand,* supra, 129 Conn. App. 250–51.

"[T]he use of a subpoena may . . . be reasonable and therefore not violate the fourth amendment." Id., 252. "A subpoena . . . commences an adversary process during which the person served with the subpoena may challenge it in court before complying with its demands. . . . As judicial process is afforded before any intrusion occurs, the proposed intrusion is regulated by, and its justification derives from, that process." (Internal quotation marks omitted.) Id.

In resolving *Legrand,* this court concluded "that the subpoena issued by the prosecutor was reasonable, and therefore did not violate the fourth amendment. As a general rule . . . [a] subpoena is an appropriate process for the production of documents that are relevant

---

[39] The are other exceptions to a warrant requirement. See, e.g., *Donovan* v. *Lone Steer, Inc.,* 464 U.S. 408, 415, 104 S. Ct. 769, 78 L. Ed. 2d 567 (1984) (defenses to valid administrative subpoena do not include warrant as condition precedent); *See* v. *Seattle,* 387 U.S. 541, 544, 87 S. Ct. 1737, 18 L. Ed. 2d 943 (1967) (administrative agency's subpoena of corporate books under fourth amendment must be limited in scope, relevant in purpose, specific in directive); *Oklahoma Press Publishing Co.* v. *Walling,* 327 U.S. 186, 208, 66 S. Ct. 494, 90 L. Ed. 614 (1946) (corporate records protected under fourth amendment only against unreasonable disclosures).

to the matter before the court." (Internal quotation marks omitted.) Id., 254–55. "[P]rior to the records being turned over to the prosecutor, [Legrand] was afforded an opportunity to object." Id., 255. At the time the subpoena was issued, a criminal proceeding had been commenced against Legrand; the subpoenaed medical records were to be a basis to impeach the physician's testimony. Id., 256–57. The prosecutor was not on a fishing expedition; the subpoena was limited in scope and purpose. Id., 257. This court concluded, on the basis of the foregoing facts, that the subpoena was reasonable and that Legrand's fourth amendment rights were not violated. Id.

Applying the foregoing legal principles to the facts before us now, we conclude that the subpoena the state issued to the department to obtain the defendant's records was reasonable and did not violate his rights under the fourth amendment. The state issued the subpoena in response to the defendant's witness list, which indicated that he would offer testimony that he did not wear eyeglasses. The subpoena was limited in scope in that it requested records relating only to the defendant's vision, not his complete medical file. The purpose of the records was to impeach the defendant's evidence and to support DeJesus' identification of the defendant as the robber. Although the department disclosed the records to the assistant state's attorney before the defendant had an opportunity to object to the subpoena, the court afforded him opportunities to object to Smyth's testimony and sustained his objections until the defendant himself opened the door by questioning DeJesus about her description of the robber. The evidence was material and relevant to the identification of the robber. Smyth's testimony was limited to when the defendant's eyes were examined and his need to wear bifocals prior to and after the robberies. We conclude that the subpoena for the defendant's records

was limited and reasonable pursuant to the fourth amendment, as the question of whether the defendant wore eyeglasses was relevant to the identification issue at trial. See *State* v. *Montgomery*, supra, 254 Conn. 728.

Finally, because the court determined that Smyth's testimony was relevant to the defendant's theory of misidentification, we conclude that the court's evidentiary ruling permitting Smyth to testify as to the defendant's need for eyeglasses did not constitute an abuse of discretion.

II

The defendant also claims that the court abused its discretion by denying his motions for reconsideration of his motion to strike Smyth's testimony and for a new trial predicated on (1) the exclusion of testimony from an expert on eyewitness identification and (2) the evidence regarding his need to wear eyeglasses. The defendant's claims fail.

"Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a new trial is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for [a new trial], we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion. . . .

"In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling.

. . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *State* v. *Ouellette*, 110 Conn. App. 401, 416–17, 955 A.2d 582 (2008), aff'd, 295 Conn. 173, 989 A.2d 1048 (2010).

The following procedural history is relevant to the defendant's claims. On September 3, 2010, the defendant filed a motion for a new trial pursuant to the fifth, sixth and fourteenth amendments to the United States constitution, and article first, § 8, and article second of the constitution of Connecticut, Practice Book § 42-53 et seq., and *State* v. *Outing*, supra, 298 Conn. 34.[40] The defendant claimed that Penrod's testimony should have been admitted pursuant to *Outing*. On September 15, 2010, the defendant filed a motion to reconsider the denial of his motion to strike Smyth's testimony and for a new trial pursuant to the fourth, fifth and fourteenth amendments to the United States constitution, article first, § 8, of the constitution of Connecticut and HIPAA.[41] In his motion with regard to Smyth's testimony, the defendant contended that the department "has now admitted that the state issued an illegal subpoena for [his] medical records," which the department in a letter to defense counsel acknowledged were " 'improperly released' . . . ."[42] The court permitted

[40] Although the defendant's motion for a new trial stated that he was relying on various state and federal constitutional provisions, his memorandum of law focused exclusively on *State* v. *Outing*, supra, 298 Conn. 34.

[41] In the defendant's motion for reconsideration of the court's denial of his motion to strike Smyth's testimony and for a new trial, the defendant stated that the motion was filed "[p]ursuant to the Fourth, Fifth and Fourteenth Amendments of the United States Constitution; Article 1, Section 8 of the Connecticut Constitution, and HIPAA . . . ." The defendant, however, did not provide any written analysis as to his constitutional claims.

[42] Attached to the defendant's September 15, 2010 motion for reconsideration to strike Smyth's testimony and for a new trial was a letter to defense counsel from Nancy Kase O'Brasky of the department's legal affairs unit, which states in part: "After making inquiries into the release of [the defendant's] optometry records, it is evident that the records were, indeed,

the parties to present argument on the defendant's motions on October 25, 2010.

Prior to sentencing on October 27, 2010, after reviewing the cases cited by the parties at oral argument, the court denied the defendant's motion for a new trial in an oral ruling. The court reviewed the procedural history noting that each side agreed that Penrod was qualified to provide expert testimony on eyewitness identification but that it had granted the state's motion to preclude Penrod's testimony. The court further stated that in *State* v. *Outing*, supra, 298 Conn. 24, our Supreme Court "signaled a willingness to revisit the holding in [*State* v. *Kemp*, 199 Conn. 473, 507 A.2d 1387 (1986), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012)], and [*State* v. *McClendon*, 248 Conn. 572, 730 A.2d 1107 (1999), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012)], and two justices have expressed that those cases should be overruled. However, the Supreme Court did not overrule *Kemp* and *McClendon* in *Outing*." The trial court found that in "*Outing*, the [Supreme] Court . . . noted that the proffered testimony of the expert was cast in general terms and that the witnesses in that case knew the defendant."

With respect to this case, the trial court stated that "the defendant narrowed the proffered testimony of Dr. Penrod, but at the end it was still cast to some extent in general terms. There was no proffer that Dr. Penrod would give an opinion that the factors that he was going

released in error. In an effort to comply, in a very short time frame, with what was perceived to be a valid court order, the records were improperly released." The letter does not explain why or how the records were released in error.

The propriety of the department's having faxed the defendant's records to the office of the state's attorney is not before us, nor are the issues of whether the department complied with HIPAA or the subpoena. Nothing in this opinion should be construed as pertaining to those issues.

to be testifying about undermined the reliability of the identification in this case. And in this case, this court stated in its decision granting the motion to exclude Dr. Penrod's testimony that there may very well be some circumstances in which the testimony may be appropriate and that it may be admitted, but in this case, the witness had seen the defendant in the store before. There was a video of each robbery shown and, in this case, unlike other cases where there's a surveillance and either there is no tape or it's been taped over or something to that effect, there's actually a videotape of the robbery that was shown to the jury and admitted into evidence. And the witnesses were cross-examined concerning their identification and there was no evidence as to the racial identity of Ms. DeJesus." The court therefore denied the motion for a new trial on the basis of *Outing*.

As to the motion for reconsideration of the motion to strike Smyth's testimony, the court stated: "The defendant has alleged that the records on which Dr. Smyth's testimony was based had been obtained by an illegal subpoena and the state should have secured the records by a search and seizure warrant. The court has considered the arguments and the documents attached to the motion. The defendant may very well have an issue with the department concerning the release of any information. However, there isn't any evidence that the state had illegally obtained the records, which were the subject of Dr. Smyth's testimony, and the records were not offered into evidence. Accordingly, that motion is denied."

On the basis of our review of the motions and the arguments to the court prior to sentencing, we cannot conclude that the court abused its discretion in denying the motions. The defendant's claim that the court abused its discretion by denying his motion for a new trial is predicated on his underlying evidentiary claims.

See part I of this opinion. Because we have concluded that Penrod's testimony was not improperly precluded, as it would not have been of assistance to the jury, and that the court did not abuse its discretion by permitting Smyth to testify, the court did not abuse its discretion by denying the defendant's motion for a new trial.

The judgments are affirmed.

In this opinion the other judges concurred.