******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* BILLY RAY WRIGHT
(AC 35507)

Lavine, Sheldon and Borden, Js.

*Argued January 9—officially released August 19, 2014*

(Appeal from Superior Court, judicial district of New
Haven, B. Fischer, J.)

*Lisa J. Steele*, assigned counsel, for the appellant
(defendant).

*Ronald G. Weller*, senior assistant state's attorney,
with whom, on the brief, were *Michael Dearington*,
state's attorney, and *John M. Waddock*, supervisory
assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The dispositive issue in this appeal is whether the trial court improperly precluded the defendant from challenging the adequacy of the police investigation into the murder of which he was convicted. We conclude that the court did improperly restrict the degree of cross-examination of certain police officers regarding the adequacy of the investigation and, accordingly, we reverse the judgment of conviction.

The defendant, Billy Ray Wright, was originally tried in 2010 for the April 27, 2008 murder of Ronald Bethea in violation of General Statutes § 53a-54a (a).[1] After a hung jury, the court declared a mistrial, and this retrial took place in 2011. The jury found him guilty, and the court imposed a sentence of sixty years imprisonment. This appeal by the defendant followed.

On the basis of the state's evidence,[2] including surveillance videos of the location where the events at issue took place, the jury reasonably could have found the following facts. At approximately 1 a.m. on April 27, 2008, the defendant, whose nickname was "Wild Billy," Brandon Bellamy, and John Brown arrived at the Cardinal's Club, a New Haven bar.[3] Outside the bar they met Denard Lester and Corey Gnomes. All five men entered the bar at approximately 1:15 a.m. At approximately 1:42 a.m., when the bar was about to close, the defendant left the bar with Lester and Brown. Outside of the bar there was a large crowd of people who had left the bar because of its closing. The defendant walked down the street to a parked car, where he procured a .44 caliber revolver. At about the same time, the victim left the bar, stood on the street outside the front door, talked with a friend, Rydel Bailey, and then talked on his cell phone. While the victim was on the phone, the defendant circled behind him, and then approached his friend, Lester, who was standing on the street corner talking with a woman, Simone Watson. Lester then gave the defendant a brief hug and handshake, known on the street as "dap." At approximately 1:47 a.m., the defendant walked behind the victim, pointed the revolver at him from underneath his jacket and shot the victim in the back. At that point, the large crowd that had gathered outside the bar scattered in various directions. The victim stumbled back into the bar and fell to the floor, where he died from the gunshot wound. The police responded to the scene within minutes of the shooting.

The defendant claims that the trial court violated his constitutional right to present a defense by limiting his cross-examination of the investigating police officers, which was intended to establish that the police investigation into the shooting was inadequate. This claim comes to us in two parts. The first part is specific, in that it focuses on the trial court's preclusion of the

defendant's cross-examination of an investigating police officer as to an altercation that the victim had in another bar approximately two hours before the shooting in question. The second part is more general, in that it focuses on the trial court's limitation of the defendant's cross-examination of the investigating police officers as to what they did or did not do by way of investigation on the night in question, and the court's preclusion of the defendant's broader scope of cross-examination as to proper police investigative procedures that would generally be followed in a case such as the present one. We reject the first, specific part of the defendant's claim. We agree, however, with the second, more general part of his claim.

We first set forth the legal principles underlying our analysis. "[A] fundamental element of due process of law is the right of a defendant charged with a crime to establish a defense." (Internal quotation marks omitted.) *State* v. *Collins*, 299 Conn. 567, 598, 10 A.3d 1005, cert. denied,    U.S.   , 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011). Further, "[i]t is fundamental that proof of guilt in a criminal case must be beyond a reasonable doubt. . . . The [reasonable doubt concept] provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." (Citation omitted; internal quotation marks omitted.) *State* v. *Jackson*, 283 Conn. 111, 116, 925 A.2d 1060 (2007). Therefore, "[a] defendant may . . . rely upon relevant deficiencies or lapses in the police investigation to raise the specter of reasonable doubt, and the trial court violates his right to a fair trial by precluding the jury from considering evidence to that effect." *State* v. *Collins*, supra, 599–600.

The United States Supreme Court has recognized that a defendant has the right to challenge the adequacy of a police investigation to raise reasonable doubt as to his guilt, stating that "indications of conscientious police work will enhance [the] probative force [of evidence] and slovenly work will diminish it." *Kyles* v. *Whitley*, 514 U.S. 419, 446 n.15, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Notably, within our body of case law, *State* v. *Collins*, supra, 299 Conn. 567, is the only case that examines this right. In *Collins*, our Supreme Court relied upon several cases decided by the Massachusetts Supreme Judicial Court with respect to a defendant's constitutional right to challenge the adequacy of a police investigation. Id., 599–600. Indeed, Massachusetts has developed a large body of case law on this issue, which we find persuasive with respect to the defendant's claims on appeal. Therefore, like our Supreme Court, we rely upon Massachusetts authority in setting forth the principle that a defendant has a constitutional right to challenge the adequacy of a police investigation.[4]

The Massachusetts Supreme Judicial Court has stated that "[t]he fact that certain tests were not conducted or certain police procedures not followed could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors." *Commonwealth* v. *Bowden*, 379 Mass. 472, 486, 399 N.E.2d 482 (1980). A defendant "ha[s] the right to base [his] defense on the failure of police adequately to investigate a murder in order to raise the issue of reasonable doubt as to the defendant's guilt . . . ." *Commonwealth* v. *Phinney*, 446 Mass. 155, 165–66, 843 N.E.2d 1024 (2006). Although a defendant's right to cross-examination is not without limitation; see *State* v. *Davis*, 298 Conn. 1, 9–10, 1 A.3d 76 (2010); *State* v. *Cerreta*, 260 Conn. 251, 261, 796 A.2d 1176 (2002); an undue limitation on cross-examination regarding deficiencies in the police investigation may constitute a violation of the defendant's right to confront the witnesses against him, under the sixth and fourteenth amendments to the United States constitution. See *Commonwealth* v. *Mattei*, 455 Mass. 840, 857–60, 920 N.E.2d 845 (2010).

I

Having set forth the legal landscape, we now turn to the first, specific part of the defendant's claim, namely, that the trial court improperly prevented him from introducing evidence of an investigating police officer's failure to conduct an adequate investigation into an altercation between the victim, his girlfriend, and two men at another bar just hours before he was murdered. The following additional facts and procedural history are relevant to our analysis of this claim.

The record reflects that the victim was involved in an altercation with two unidentified men in another bar, Solomon's Café, approximately one and one-half hours before the shooting at the Cardinal's Club. More specifically, during the cross-examination of Herbert V. Johnson III, a sergeant with the New Haven Police Department, the defendant sought to inquire of the victim's whereabouts prior to the shooting that evening. Upon the state's objection, the jury was excused. The defendant stated that he wanted to challenge the adequacy of the police investigation by inquiring into what steps Johnson took or failed to take to determine whether the unknown persons at the other bar had anything to do with the shooting at the Cardinal's Club. The defendant then made an offer of proof through the testimony of Johnson, still in the absence of the jury.

Johnson testified that as part of his investigation of the murder at the Cardinal's Club he spoke with the bartender of Solomon's Café, who indicated to him that the victim had been involved in an argument with his girlfriend, which resulted in what the bartender characterized as a "tussle" between them. Two men, one wholly unidentified and the other known only as "Perry"

or "Player," broke up the argument by grabbing the victim, and the victim's girlfriend then ran out of the bar. The bartender told Johnson that the two men were not fighting with the victim, but were his friends who were trying to calm the situation. The defendant asked Johnson whether he had done anything to find out if the unidentified man matched the image of the shooter on the video. Johnson responded that, after becoming aware of the physical description of the shooter at the Cardinal's Club, he did not investigate this incident further, or show the image of the person in the video to the bartender at Solomon's Café.

The trial court sustained the state's objection to this evidence on the ground that it was proffered as third party culpability evidence, and that it did not meet the standard for admissibility of such evidence. See, e.g., *State* v. *Ortiz*, 252 Conn. 533, 564, 747 A.2d 487 (2000) (evidence of third party culpability must directly connect third party to crime charged in order to be admissible). The next day, the defendant renewed his claim for admissibility, clarifying that the basis of his claim was to challenge the adequacy of the police investigation, and that contrary to the mischaracterization of his offer of proof by both the state and the court, it was never offered as third party culpability evidence. The trial court affirmed its ruling, making clear that it regarded the proffered evidence only as third party culpability evidence, and affirming its conclusion that the evidence fell short of the standard of admissibility for such evidence.

In analyzing the defendant's appellate claim, we first note that we agree with the defendant that the trial court improperly ignored his clearly stated basis for the admissibility of the evidence, namely, to support his claim of an inadequate police investigation. Evidence of an inadequate police investigation need not meet the strict standard of establishing a direct connection between a third party and culpability for the crime charged. See *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 800–803, 906 N.E.2d 299 (2009). Its purpose is not to establish that someone other than the defendant is culpable; rather, it is to establish that, because the police investigation was inadequate, there may be reasonable doubt about the defendant's guilt. Id. Furthermore, the court was not entitled to recharacterize the defendant's claim—namely, that the evidence was being offered to show the inadequacy of the police investigation—into a third party culpability claim. Although there are, as the state suggests, times when the court is permitted to look at the evidence offered and rule on what it sees as the "true" nature of its relevance; see, e.g., *State* v. *Cornelius*, 120 Conn. App. 177, 188, 990 A.2d 927 (*Harper, J.*, concurring), cert. denied, 296 Conn. 910, 993 A.2d 467 (2010); see also *State* v. *DeJesus*, 260 Conn. 466, 481, 797 A.2d 1101 (2002); this is not such a case.

This does not mean, however, that the defendant may prevail on this claim, because he was not harmed by the court's mischaracterization of the nature of his claim. "[I]f an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . In a harmless error analysis, the question is whether the trial court's error was so prejudicial as to deprive the defendant of a fair trial . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Ramirez*, 101 Conn. App. 283, 286–87, 921 A.2d 702, cert. denied, 283 Conn. 909, 928 A.2d 539 (2007), cert. denied, 552 U.S. 1109, 128 S. Ct. 895, 169 L. Ed. 2d 747 (2008). The defendant was not hindered in any way in making his offer of proof. And that offer of proof did not establish any inadequacy of the police investigation of the incident at Solomon's Café. We can discern nothing in Johnson's testimony, elicited by the defendant as his offer of proof, to suggest that further police investigation of the incident was warranted or would have helped establish a reasonable doubt about the defendant's guilt regarding the shooting at the Cardinal's Club. Johnson's testimony showed no more than that, about one and one-half hours before the shooting at the Cardinal's Club, the victim got into a tussle with his girlfriend and that two of his friends intervened to calm the situation.

II

Despite our determination that the defendant's more specific claim fails on appeal, we reach a different conclusion with regard to his second, more general claim. Namely, the defendant claims that the trial court improperly limited the scope of his cross-examination of the investigating police officers as to what they did or did not do by way of investigation on the night in question, and correspondingly, that the court improperly precluded a broader scope of cross-examination into proper police investigative procedures generally followed in a case such as the present one. We conclude that the trial court's limitation of the scope of the defendant's cross-examination into proper police investigative procedures generally followed in a case such as this deprived the defendant of a fair trial. The following additional facts and procedural history guide our analysis of this claim.

On numerous occasions throughout the trial, the court sustained the state's objections to cross-examination of four police witnesses, whereby the defendant sought to elicit testimony as to whether the police, in not pursuing certain avenues of investigation or possible procedures, were acting in accord with past practices or with what could be regarded as standard police investigative procedures.

David Parker was one of the two first New Haven

police officers to respond to the scene. On cross-examination, the defendant established that when Parker arrived there were several people outside the bar, many of whom were in the process of leaving the scene. Parker testified that he took no steps to determine whether there were any witnesses to the shooting, or to interview any of the people who were leaving the scene. The defendant then asked: "And would you agree with me that once those people leave, they are gone? You are not going . . . to have an opportunity to question them, correct?" The court sustained the state's objection on the ground that the question called for speculation. The defendant then asked a more general question: "And when you [arrive] at a shooting, do . . . you try to determine whether nor not any witnesses were at the scene?" Upon the state's objection that the question had been asked and answered, and that "it is not relevant to what happened on this particular night," the defendant responded: "It's not just what he did, Your Honor, that's relevant. It's also what he didn't do that's relevant." The court sustained the objection.

The next witness, Terrence McNeil, testified that he had been a patrol officer for thirteen years, and that he also responded immediately to the scene of the shooting. He first went inside the club, where he saw the victim on the floor receiving treatment, and then went back outside to the sidewalk. He made several efforts to speak to the people there, but "[n]obody wanted to get involved." On cross-examination, he testified that at that time he was acting under the assumption that the shooting had taken place inside the club, rather than outside on the sidewalk. The defendant asked: "So, operating on the assumption that the shooting occurred in the club, it wasn't necessary for you to go across the street and canvass whether or not somebody had seen anything?" McNeil answered: "No." The defendant then asked: "Okay. And had you been aware of information that the shooting occurred outside of the club, it's something you would have done, correct?" The court sustained the state's objection on the ground that the question called for speculation. The defendant then asked: "Well, you've responded in your thirteen years to many shootings in New Haven, correct?" McNeil answered: "Yes." When the defendant asked, "And one of the things you want to determine is where the shooting occurred, correct?" the state objected on the ground that "[w]hat is relevant is what that officer did that night. What he did with regard to other investigations is not relevant." The defendant claimed: "Well, again, the state claims to think that the only relevance of an officer's testimony is what he did, where in fact, it is also relevant what he didn't do." The court sustained the objection: "It's not relevant. What's relevant is his actions on the evening of April 27, 2008. So, I will not allow the question."

Upon redirect examination, McNeil testified that

while he was outside the bar, no one came up to him and volunteered any information, that no one from across the street approached him with an offer to cooperate, and that when he approached people to attempt to speak to them "they didn't want to get involved. They started walking away from me into their cars." Upon recross-examination, when the defendant sought to ask McNeil about whether witnesses are often reluctant to speak to the police and whether that was "a reaction that was new to [him], people not wanting to get involved . . . ?" the court sustained the state's objection, stating, "Counsel, it has to be related to this day." Following this exchange, the defendant asked: "When you are faced with this noncooperation by the people you spoke to, was there anything you could have done in light of that noncooperation to secure their cooperation?" McNeil answered: "No, no." When the defendant sought to follow up on this inquiry by asking, "Well, wouldn't some of the people not want to give you information in front of other people? . . . Is that . . . one of the things you were cognizant of?" the court sustained the state's objection as calling for speculation. The defendant then asked: "Well, if you had their names, that you didn't secure, and you approached them when they were home and not in front of a crowd of people, is that something that is done . . . on occasion?" The court sustained the state's objection. The defendant then asked: "You couldn't have done that?" The court sustained the state's objection, stating: "He answered no to the question. And . . . I will not allow a follow-up on that line of question[ing]."

In the jury's absence, the defendant then made the following claim: "In regard to . . . my cross-examination to what was done by the police officers in this case, the state is going to get up and argue during closing argument, at least in everything humanly possible, as—and they were unable to have any witnesses, it's not their fault. The fact of the matter is, Your Honor, that they didn't do everything humanly possible. And what they didn't do is as relevant in this case as what they did do because they do not have any eyewitness to this shooting, and what steps they . . . took or didn't take to secure an eyewitness is important. Now, for me not to be able to ask an officer when you . . . canvass a crowd of people and say, does anybody have any information and . . . we all know in the real world a lot of people don't come forward to be labeled a snitch in front of a crowd . . . but had he gotten identification, which he could have gotten, then he could have approached these people when they had been alone to try to determine whether or not anybody had seen anything.

"I'm sure the state is going to say the police did everything they could but nobody cooperated. And, Your Honor, nobody cooperated at the scene, but that did not foreclose them from pursuing other avenues

with the same people had they gotten their names. And for me not to ask a police officer, isn't it true that some people are not forthcoming in groups but when approached later in a one-to-one situation have provided information? And why didn't you take steps to ensure that you identified those people so you could at a later date go to them outside of a group of people to ask them if they had seen anything? I mean, I . . . don't understand why I would be foreclosed from . . . inquiring as to why [they] didn't do those things." The court responded: "All right. . . . I made my rulings based on what this witness said here. I don't know what else I'm going [to] hear from detectives who were in charge and investigating this case. But I . . . made my rulings with relevancy with this patrol officer concerning his activities on April 27, 2008."

Next, Sergeant Johnson testified that he, then a detective, arrived at the scene approximately one hour and ten minutes after the shooting. He was the first detective to arrive, the second being Detective Mike Hunter, who arrived some time thereafter.[5] Johnson determined that there were nine security cameras at the scene, and he took steps to record all nine videos onto a memory stick. He was informed that the shooting had taken place outside the club. On cross-examination, the defendant asked him whether he was able to "determine whether anybody was outside smoking when the shooting occurred . . . ." The state objected on the ground of relevance. The defendant claimed that, "again, Your Honor, what steps were taken to secure witnesses to the shooting is relevant and what steps were not taken." The court sustained the objection as irrelevant.

Bridgett Brosnahan, a detective who had been with the New Haven Police Department for more than eleven years, testified that she was assigned to the department's bureau of identification, responsible for processing the crime scene for any physical evidence of evidentiary value, which she described as "respond[ing] to crime scenes, . . . and recogniz[ing] evidence at a scene, collect[ing] evidence and preserv[ing] evidence." She had arrived at the scene approximately three hours after the shooting. Among the items that she took into her possession of possible evidentiary value were some "fiber-like materials" recovered from the crime scene.

On cross-examination, she testified that, with respect to the fiber-like material, "the possibility exist[ed]" that it came from the shirt of the shooter. She further testified that, although the fiber-like material could have been tested at the state police forensic laboratory for color and composition, it was not tested because there was nothing to which it could be compared. The state objected when the defendant asked her "who would have made [the] call" as to whether the items would be further tested. After a discussion in the jury's absence, Brosnahan was permitted to testify that "[d]etectives

working on the case" would determine whether the fiber-like material she believed had potential evidentiary value would be tested. The defendant sought to follow up on this answer by asking, "not just . . . about this case," but "when you work on [a] case with the detectives, since you are the forensic person . . . do you ever suggest to them that further testing is necessary?" Upon the state's objection, the defendant stated: "I'm asking about general procedures between [the bureau of identification] and detectives." The court ruled, again, that the defendant could not ask about general procedures and was limited to asking about the procedures in this particular case. Similarly, when the defendant questioned Brosnahan as to whether it would have been helpful to test the fiber-like material, given its potential evidentiary value—particularly, given that such testing could reveal the color and composition of the shooter's shirt—the court sustained the state's objection as calling for speculation.

We conclude that the court improperly limited the scope of the defendant's cross-examination of these police officers, and that this limitation violated his right to a fair trial. We do so for two reasons.

First, we note the tenuous nature of the state's case. The victim was shot in the presence of about twenty-five people. Although the shooting was captured on video, no one identified the defendant in the video footage. Of the approximately twenty-five persons who were within a few feet of the shooter and victim when he was shot, only four testified, and none of those four said they saw the shooting. Only one of them had identified the defendant as being present outside the bar at the time in question and, inferentially, identified the defendant as the shooter; but that witness unequivocally disclaimed that identification at trial. There was a noteworthy lack of effort by the police to identify and question any of the other persons shown on the video as potential witnesses to the shooting. There was no effort to canvass the area or houses across the street to see if anyone there had seen the shooting. Only two persons, namely, the two owners of the bar, identified the defendant as being present in the bar that night, but their testimony was subject to the classic vagaries and frailties of eyewitness identification by strangers. There was no evidence of motive, and no evidence that the victim and defendant even knew each other. Indeed, there was no evidence that the defendant even knew Bellamy, Brown or Gnomes, with whom, the state claimed, solely on the basis of the video, he arrived at and entered the bar. There was no forensic evidence connecting the defendant to the crime.[6] Thus, in our view, this was a case in which the defendant's claim of reasonable doubt might well have succeeded, and he should have been given appropriate leeway to challenge the adequacy of the police investigation in the way he sought at trial and renews here: to challenge not only

what the police did or did not do on the night in question, but also what they, as trained and experienced investigating police officers, are expected to do generally when investigating a murder case such as the present one.

As the defendant repeatedly claimed in the trial court, what the police did not do was arguably as important as what they did do. And, in that connection, it was equally important for the defendant to be permitted to bring to the attention of the jury any differences there may have been between what they did not do in this investigation and general or ordinary police procedures that they had followed in other murder cases. The court's insistence on limiting the defendant to the conduct of the police on the night in question significantly curtailed that important inquiry in the present case.

Second, we note that this court and our Supreme Court have often recognized that police officers, by virtue of their training and experience, may be considered expert witnesses in various contexts other than ordinary police procedures. See, e.g., *State* v. *Vilalastra*, 207 Conn. 35, 45, 540 A.2d 42 (1988); *State* v. *Palmer*, 196 Conn. 157, 168, 491 A.2d 1075 (1985); *State* v. *Cosgrove*, 181 Conn. 562, 587–88, 436 A.2d 33 (1980); *State* v. *Williams*, 169 Conn. 322, 334, 363 A.2d 72 (1975); *State* v. *Grayton*, 163 Conn. 104, 111, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495 (1972); *State* v. *Del Vecchio*, 145 Conn. 549, 553, 145 A.2d 199 (1958); *State* v. *Pjura*, 68 Conn. App. 119, 127–28, 789 A.2d 1124 (2002); *State* v. *Holeman*, 18 Conn. App. 175, 179–81, 556 A.2d 1052 (1989). We can see no reason why the same breadth of permissible testimony should not be applied when the police were asked, on the basis of their training and experience, whether general or ordinary procedures of police investigation were followed in the present case.

We recognize the obligation of the trial court to avoid lengthy cross-examination on hypothetical or collateral issues that might distract the jury from its task of deciding guilt or innocence in the case at hand. See, e.g., *State* v. *Annulli*, 309 Conn. 482, 493, 71 A.3d 530 (2013). That obligation, however, must be balanced against the defendant's constitutional right to challenge the evidence against him in order to raise reasonable doubt as to his guilt. In this case, we conclude that the court could have given the defendant further leeway in cross-examining the investigating police officers regarding standard police procedures, without injecting collateral issues into the trial, and should have done so. We therefore conclude that the court's limitations on the defendant's cross-examination of the police witnesses violated his right to a fair trial.

It is true, as the state argues, that the court permitted the defendant to inquire into what the police did not do that night—for example, that they did not canvass

people in the houses across the street for possible witnesses to the shooting, and that they did not attempt to identify by name any of the people still standing outside the club when the police arrived. But the court did not, as the defendant rightly points out, permit him to expand on that inquiry by comparing what they had and had not done in this case to what they had done by following standard procedures in other similar cases.

We have referred to the tenuous nature of the state's case. We turn, now, to a further explication of that characterization in order to demonstrate the harmfulness of the court's limitation on the defendant's cross-examination.

The principal source of evidence in the state's case was two videos comprised of footage captured from security surveillance cameras at the bar. The first video was a composite video, taken from nine surveillance cameras, showing scenes outside and inside the bar before the shooting, and including footage showing the actual shooting outside the bar. The second video depicted the segment of the composite video footage showing the actual shooting outside of the bar, which had been enlarged for the intended purpose of increasing the clarity of the images. The videos were supported by the testimony of a police forensic expert who explained to the jury how the videos had been composed and, to some extent, what the videos showed. The videos were of a grainy, indistinct nature and, despite the unsuccessful efforts of the police expert to enhance the videos, the face of the shooter was not recognizable. The videos showed that the shooting took place in the presence of approximately twenty-five persons, all of whom were within a few feet of the shooter and the victim.

The videos showed that, shortly before the shooting, Lester gave "dap"—a brief hug and handshake—to a person who then circled behind the victim and shot him. The defendant did not dispute that the person to whom Lester gave "dap" was the shooter. The videos also showed a person, whom the state claimed to be the defendant, entering the bar at 1:15 a.m. where he remained until 1:42 a.m., shortly before the shooting. At that time, the person whom the state claimed to be the defendant left the bar and stood on the sidewalk outside the bar with approximately twenty-five other persons, including the victim. He then left the sidewalk area in front of the bar and went to a nearby area where there was a car,[7] and then returned to the area in front of the bar where he shot the victim, as previously described. There was also testimony, which the videos corroborate, that just after the shooting some of the other persons in the area ran away. Thus, it was critical to the state's case to establish identification, namely, that the person to whom Lester gave "dap," and who, therefore, was the shooter, was the defendant. The evi-

dence supporting that identification, along with the evidence undermining that identification, was as follows.

First, Lester testified that he knew the defendant only by the name of "Wild Billy." He acknowledged that, at the first trial, he had identified the defendant as the person to whom he gave "dap" and with whom he had a brief conversation on the night in question. He testified further that, as he was walking away from the sidewalk in front of the bar with Watson,[8] he heard gunshots and that the two of them ran to his car, which was parked on a nearby street. They met Gnomes at the car, and the three of them drove away. Lester also testified, however, that he was "under the influence" that night, and he ended his testimony with the unequivocal assertion that the defendant was not the person to whom he gave "dap" that night.[9]

Second, although the state's theory, which was based on the video, was that the defendant arrived at the club with Bellamy and Brown, where they then met Lester and Gnomes, and the five of them then entered the club, Gnomes testified that he arrived at the club only with Lester, where they met Bellamy, and the three of them entered the club. Gnomes also testified that he did not know or recognize anyone outside the club other than Lester and Bellamy. He further testified that upon leaving the club with Lester and upon hearing a gunshot, he, Lester and Watson ran to his car, which was parked on a nearby street, and they drove off without returning to the scene of the shooting. He further testified that he did not see who fired the shot. Thus, he did not identify the defendant in any way or connect him to the shooting.[10]

The only other individuals to identify the defendant as being present in the bar that night were the bar owners, Jeffrey Dominic Parker and Joyce Bellamy, both of whom were inside the bar when the shooting took place, and neither of whom had been acquainted with the defendant before that night. On May 10, 2008, Parker identified a photograph of the defendant as someone who was in the bar on the night in question.[11] He could not, however, identify the defendant in the courtroom as having been in the bar that night. Similarly, Bellamy, on May 10, 2008, identified a photograph of the defendant as being in the bar that night. In addition, she identified the defendant on the video of the interior of the bar as the person whose photograph she had identified. Both sets of identifications, by Parker and Bellamy, were made pursuant to simultaneous photographic arrays[12] conducted by Detectives Hunter, the detective in charge of the investigation of the case, and Steven Teague.

These identifications by Parker and Bellamy must, however, be viewed with some degree of skepticism. Recently, our Supreme Court has noted the wide scientific acceptance of a number of factors that may under-

mine the reliability of certain eyewitness identifications. See *State* v. *Guilbert*, 306 Conn. 218, 237–39, 49 A.3d 705 (2012). Among the most important of those is the fact that "a person's memory diminishes rapidly over a period of hours rather than days or weeks," and the fact that "identifications are likely to be less reliable in the absence of a double-blind, sequential procedure . . . ." (Footnotes omitted.) Id., 238–39. These identifications took place on May 10, 2008, approximately two weeks after the event in question; they were simultaneous, not sequential; and they were not "double blind."[13]

When, as in the present case, we have identified a violation of the defendant's constitutional right to a fair trial, it is the state's burden to establish harmlessness beyond a reasonable doubt. See *State* v. *Ramirez*, supra, 101 Conn. App. 286. The frailties in the state's case lead us to conclude that the state cannot meet that substantial burden in the present case. In summary, neither the surveillance videos nor witness testimony definitively placed the defendant at the scene of the crime. The video footage was captured from a distance, and was of a grainy and indistinct quality that obscured the shooter's facial features. Two of the state's witnesses identified the defendant as being present inside the bar on the night in question, but we view those identifications with the necessary degree of skepticism attributed to eyewitness identifications of strangers. Moreover, of the approximately twenty-five witnesses present at the scene of the shooting, only four testified at trial. Yet, of those four, none testified to having witnessed the shooting, and the only explanation of the absence of any attempt to identify any of the other approximately twenty-one potential witnesses to the shooting was that they, the witnesses, appeared at the scene not to want to get involved. No attempt was made to see if any person across the street at the time of the shooting had seen the shooting. The fiber-like material taken at the scene, which, according to Brosnahan, might have come from the shooter's shirt, was not tested. Finally, Lester, the only witness who previously had testified that the defendant was present at the scene of the shooting, recanted that testimony, and emphatically stated on cross-examination that the defendant was not the individual to whom he gave "dap," whom the parties agreed was the shooter. Thus, under the circumstances of the present case, we conclude that the state has failed to meet its heavy burden of establishing that the court's undue limitation on the defendant's cross-examination regarding the adequacy of the police investigation was harmless beyond a reasonable doubt.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

[1] "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ." General Statutes

§ 53a-54a (a).

[2] The defendant did not offer any evidence.

[3] Notably, the time line set forth herein corresponds with the state's theory of the case that the time-stamps that appear in the surveillance videos were approximately ten minutes fast. This inference was supported by the testimony of John Brunetti, a forensic science examiner with the state police forensic laboratory, who testified that the time is programmed manually on the surveillance video cameras. That inference also was supported by the testimony of various investigating police officers regarding the times at which they were dispatched to the crime scene.

[4] In addition to Massachusetts, several other jurisdictions have developed case law supporting the proposition that a defendant has a constitutional right to challenge, by way of evidence, the adequacy of a police investigation, in order to raise reasonable doubt as to his or her guilt. See, e.g., *Smith* v. *United States*, 27 A.3d 1189, 1197, 1199 (D.C. 2011); *Hall* v. *Lewis*, 286 Ga. 767, 782, 692 S.E.2d 580 (2010); *Atkins* v. *State*, 421 Md. 434, 452–53, 26 A.3d 979 (2011); *State* v. *Hester*, 127 N.M. 218, 222, 979 P.2d 729 (1999); *Commonwealth* v. *Waddler*, 65 Va. Cir. 418, 432 (2004).

[5] Hunter did not testify at the trial.

[6] The only physical forensic evidence introduced at trial was that the shooter used a .44 caliber revolver. This determination was made from the bullet fragments taken from the victim's body.

[7] It was the state's theory of the case that, because the defendant, along with all the other bar patrons, had been searched for weapons by the bar owners upon entering the bar, he obtained the .44 caliber revolver from the car.

[8] Watson was unavailable to testify at trial, and her testimony was thus presented from the transcript of the first trial. The substance of her testimony was that she had been at the club that night, that she left the club with Lester, that as they stood outside the club, a man, whom she could not identify, talked briefly with Lester and gave Lester "dap," and that, as she and Lester were walking away, she heard gunshots and they ran away.

[9] The defendant's counsel asked Lester: "Look over here at this man, a real good look. This is not the man you gave dap to that night, is it?" Lester responded: "No."

[10] The state also presented the testimony of Bailey, a friend of the victim, who had arrived at the bar with the victim and Perry Flowers. Bailey testified that the victim was "[r]ight in front of" him when the victim was shot, that Bailey ran when the shooting took place, and that he then went back into the bar to try to help the victim, who had staggered back into the bar. He also testified that, although the police had showed him some photographs, he could not identify anyone in them.

[11] Jeffrey Dominic Parker also identified, from two other, separate photographic arrays, Brandon Bellamy and Brown, whom he knew as previous customers, as having been in the club that night.

[12] A simultaneous photographic array is one in which the witness is shown a photograph board containing six or eight photographs, only one of which is of the suspect. This is in contrast to a sequential photographic array, in which the witness is shown the photographs one at a time. See *State* v. *Williams*, 146 Conn. App. 114, 129 n.16, 75 A.3d 668, cert. granted on other grounds, 310 Conn. 959, 82 A.3d 626 (2013).

[13] A double blind photographic array is "administered by an uninterested party without knowledge of which photograph represents the suspect." *State* v. *Marquez*, 291 Conn. 122, 132, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).