******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* STANLEY WILLIAMS
(SC 19250)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued March 16—officially released July 28, 2015*

*Lisa A. Vanderhoof*, assigned counsel, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Amy Sedensky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, C. J. This case raises the question of whether the trial court abused its discretion in disallowing a criminal defendant from introducing expert testimony on the fallibility of eyewitness identifications. The defendant, Stanley Williams, appeals[1] from the judgment of the Appellate Court affirming his conviction, following a jury trial, of two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3), two counts of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), and being a persistent dangerous felony offender in violation of General Statutes § 53a-40 (a). *State* v. *Williams*, 146 Conn. App. 114, 116–17, 75 A.3d 668 (2013). The defendant claims that the Appellate Court improperly concluded that the trial court acted within its discretion in precluding his expert from testifying because the Appellate Court reasoned that the eyewitness in question had sufficient prior familiarity with the defendant such as to make her identification of him reliable. We disagree with the defendant's claim and, accordingly, affirm the judgment of the Appellate Court.

The jury reasonably could have found the following facts, which the decision of the Appellate Court aptly recounts and the record otherwise reflects. On May 12, 2009, the Ideal Package Store on Hill Street in Waterbury (liquor store) was robbed when Satnam Kaur, whose husband owned the store, was working there alone. Id., 117. The robber pretended to shop for beer, then, when no other customers were in the liquor store, grabbed Kaur, put a large kitchen knife to her neck, forced her toward the cash register and stole approximately $400. Id., 117–18. Kaur's family members provided police with footage from the liquor store's video surveillance system. Id., 121. Kaur described the robber to police,[2] but could not identify him from a subsequently produced photographic array. Id., 121–22.

On May 14, 2009, two days after the liquor store robbery, "a robbery occurred at the Overstock Outlet (outlet store) on Wolcott Street in Waterbury, where Marlyn DeJesus was working alone. The outlet store sold clothing and other merchandise. When the defendant entered the [outlet] store, DeJesus was working near the cash register in the front of the store. She recognized the defendant by sight as a regular customer and greeted him, as she did all customers. The defendant went directly to the rear of the [outlet] store, and DeJesus returned to what she was doing at the counter.

"The defendant removed a number of shirts from a rack and took them to the counter. DeJesus was standing approximately one foot away from the defendant and was able to see his face. DeJesus rang up the cost of the shirts and told the defendant how much he owed. Because the defendant just stared at her, DeJesus

repeated the cost of the shirts. She then looked down, saw that the defendant's hands were partially concealed inside his sweatshirt and that he was wearing latex gloves. When the defendant withdrew his hands from his sweatshirt, he was holding a knife in his right hand. He grabbed DeJesus with his left hand, placed the knife at her neck and ordered her to open the cash register, which she did. The defendant removed cash from the drawer and asked DeJesus where the rest of the money was. DeJesus told him there was no more money. The defendant threw DeJesus to the floor, held the knife at the back of her neck and told her not to move or he would kill her. As he fled, the defendant took DeJesus' purse. After she heard the door chimes ring, indicating that the defendant had left the outlet store, DeJesus called 911 and locked the door. Two police officers arrived at the [outlet] store. Although she initially was very upset, DeJesus calmed down while the police transported her to the station, where she provided a written statement." Id., 119.

At the scene, DeJesus reported to the responding officers what had occurred, and described the perpetrator as clean shaven, forty to forty-five years old and about five feet, eight inches tall. In her subsequent written statement, DeJesus described the robber as having a thin goatee, being five feet, six inches to five feet, eight inches tall, medium build, black, about forty years old and wearing a black knit hat and black hoodie. The statement further recites that DeJesus had "seen this black man in the store before." DeJesus was presented with a photographic array by an officer who had not prepared the array, and she was instructed that the array might or might not contain a suspect's photograph.[3] *State* v. *Williams*, supra, 146 Conn. App. 122. DeJesus immediately identified the defendant as the man who had robbed her, and the officer told her the defendant's name and birth date, but not that he was a suspect.[4] Id. At some point, police obtained video surveillance evidence of the robbery from the outlet store. Id., 123.

"On May 16, 2009, the defendant was apprehended at his residence on Garden Circle in Waterbury, which is located halfway between the liquor store and the outlet store. The defendant was charged in separate informations, in connection with the robberies previously described, with one count in each of robbery in the first degree in violation of § 53a-134 and unlawful restraint in the first degree in violation of § 53a-95 (a)."[5] Id., 120.

The defendant elected a jury trial, which was held in July, 2010. At trial, his theory of defense was misidentification. Prior to the start of trial, the state moved to preclude the testimony of the defendant's disclosed expert witness, Steven Penrod, a psychologist, who was to testify as to the various factors that affect the accu-

racy of eyewitness identifications, and to opine that certain of those factors rendered any identification of the defendant, by either Kaur or DeJesus, unreliable. The defendant's initial written proffer indicated that Penrod would testify generally about the process and stages of memory, and about various things that could happen at each stage that could affect the formation, retention and retrieval of memories. The defendant subsequently submitted a supplemental proffer explaining how the proposed expert testimony would relate to the specific facts of this case.[6] The trial court deferred ruling on the state's motion to preclude.

During the defendant's trial, the jury was shown moving and still images from the liquor store surveillance system, and Kaur testified that the images accurately depicted how the robbery had occurred. Id., 121. Kaur again described the robber, and her previous statement to the police was introduced, in part, into evidence; see *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986); but she could not identify the robber as being in the courtroom. *State* v. *Williams*, supra, 146 Conn. App. 121–22.

Moving images from the outlet store robbery also were shown to the jury, and DeJesus testified that the video accurately depicted the robbery. Id., 123. She testified that she recognized the robber as a "regular customer" when he entered the outlet store,[7] and "described [him] as black, older, maybe in his late forties, short, scruffy looking, having a gray beard and wearing a black ski hat and a black hoodie." Id., 122. DeJesus described details of the defendant's mouth and explained that he reminded her of someone with whom she had gone to school, causing her to wonder if the two were related. Her identification of the defendant from the photographic array was published to the jury, and she also identified the defendant in the courtroom. Id., 122–23. On cross-examination, DeJesus added that the defendant, at the time of the robbery, was wearing " 'big glasses,' " a detail that she had not mentioned in her written statement.[8] Id., 123.

The jury was shown photographs of the defendant taken five days after the outlet store robbery, including a profile shot. Id. The photographs depict the defendant with a thin, white or gray goatee. Id. Writing on one photograph indicated that the defendant was born in 1958, making him fifty years old at the time of the robberies, and that he was five feet, five inches tall, and weighed 130 pounds. Id. The state adduced additional evidence showing that, at the time of the robbery, the defendant needed prescription eyeglasses for both reading and distance. Id., 123–24.

After the state presented its case, the defendant moved for a judgment of acquittal. The trial court denied that motion and, further, granted the state's motion to

preclude the defendant's expert testimony. The court reasoned, in part, that the jurors were qualified to weigh the evidence themselves, including the testimony and videotape of the incidents in question, and to determine what weight should be given to DeJesus' identification of the defendant. The trial court indicated that, prior to its ruling, it had reviewed, among other authority, this court's opinions in *State* v. *Kemp*, 199 Conn. 473, 507 A.2d 1387 (1986), and *State* v. *McClendon*, 248 Conn. 572, 730 A.2d 1107 (1999).[9]

Further proceedings were held on the charge of being a persistent dangerous felony offender. Thereafter, the jury found the defendant guilty as previously described herein, and he was sentenced to twenty-five years imprisonment. *State* v. *Williams*, supra, 146 Conn. App. 120. On September 3, 2010, the defendant filed a motion for a new trial, arguing that this court's recent decision in *State* v. *Outing*, 298 Conn. 34, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011), demonstrated that the trial court's exclusion of his proposed expert testimony was improper.[10] The trial court denied the defendant's motion, and his appeal to the Appellate Court followed.

In the Appellate Court, the defendant claimed, inter alia, that the trial court had abused its discretion by precluding him from presenting Penrod as an expert witness on the reliability of eyewitness identifications. *State* v. *Williams*, supra, 146 Conn. App. 124–25. In deciding this claim, and ultimately rejecting it, the Appellate Court reviewed and applied this court's recent decision in *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), which had been released during the pendency of the defendant's appeal. In *Guilbert*, we overruled *State* v. *Kemp*, supra, 199 Conn. 473, and *State* v. *McClendon*, supra, 248 Conn. 572, to the extent that those cases had indicated that the reliability of eyewitness identifications was a matter within the knowledge of the average juror and that expert testimony on the topic necessarily was unhelpful or would invade the province of a jury.[11] *State* v. *Guilbert*, supra, 251–53. The Appellate Court determined that, although the trial court in the present case had based its decision to preclude the defendant's expert testimony on grounds that were inconsistent, in part, with *Guilbert*, the trial court nevertheless did not abuse its discretion given the particular facts and circumstances of the case. *State* v. *Williams*, supra, 138–39. The Appellate Court concluded, in short, that expert testimony would have been of limited utility to the jury in the present matter because DeJesus, similar to an eyewitness in *Guilbert*, already was familiar with the defendant prior to his perpetration of the robbery at the outlet store and recognized him as a regular customer prior to the robbery taking place. Id., 139–40.

Following the release of the Appellate Court's opin-

ion, the defendant filed a motion for reconsideration, arguing that DeJesus' familiarity and previous contact with the defendant were insufficient to render insignificant the risk of her misidentifying him. According to the defendant, DeJesus' limited familiarity with him was a reason to permit expert testimony, not a reason to preclude it. The Appellate Court denied the defendant's motion for reconsideration, and his appeal to this court followed. The defendant now claims, as he did in the Appellate Court, that the trial court's preclusion of his proposed expert testimony was an abuse of discretion. We are not persuaded.

We begin with the applicable standard of review. "We review a trial court's decision to preclude expert testimony for an abuse of discretion. . . . We afford our trial courts wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on untenable grounds . . . or involves a clear misconception of the law, we will not disturb its decision." (Citations omitted; internal quotation marks omitted.) *Weaver* v. *McKnight*, 313 Conn. 393, 405, 97 A.3d 920 (2014). Even "[i]f we determine that a court acted improperly with respect to the admissibility of expert testimony, we will reverse the trial court's judgment and grant a new trial only if the impropriety was harmful to the appealing party." Id.

The standards for admitting expert testimony are well established. "Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . [T]o render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." (Internal quotation marks omitted.) Id., 405–406; see also Conn. Code Evid. § 7-2 ("[a] witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue").

In *State* v. *Guilbert*, supra, 306 Conn. 218, we revisited the question of whether the factors affecting the reliability of eyewitness testimony generally were within the knowledge of the average juror such that expert testimony on that subject typically would be unnecessary. We concluded, ultimately, that such testimony is admissible if the trial court determines that the expert is qualified and that the proffered testimony is relevant and would aid the jury. Id., 226. We renounced the reasoning of *Kemp* and *McClendon*; see footnote 9 of this opinion; as "out of step with . . . widespread judicial recognition," underpinned by extensive and consis-

tent scientific research, "that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror." *State* v. *Guilbert*, supra, 234. In sum, we disavowed the previously expressed notions that the factors undermining the reliability of eyewitness testimony were common knowledge and that permitting expert testimony on those factors amounted to an improper invasion of the province of a jury to weigh evidence. Id., 251–52.

We emphasized in *Guilbert*, however, that the decision did not mean that expert testimony necessarily was required in all cases involving eyewitness identifications. Rather, consistent with our preexisting jurisprudence governing the admission of expert testimony, trial courts were to retain "broad discretion in ruling on the qualifications of expert witnesses and determining whether their opinions are relevant. . . . Consequently, whether to permit expert testimony concerning the reliability of eyewitness identification evidence in any individual case ultimately is a matter within the sound discretion of the trial court. A trial court may bar expert testimony on the fallibility of eyewitness identifications if it reasonably concludes that the witness does not qualify as an expert or . . . lacks an adequate scientific foundation for one or more of his opinions concerning the eyewitness identification at issue. *Similarly, the trial court may preclude such testimony if the court reasonably determines, upon due consideration of the facts and circumstances of the case,* that the particular issue presented is not beyond the ken of the average juror or *that the proffered testimony would not aid the jury in resolving the issues presented.*" (Citation omitted; emphasis added.) Id., 257. Stated otherwise, "such evidence is subject to the same threshold reliability and relevance requirements as any other expert testimony." Id. We further reiterated that trial courts retain the discretion to decide whether, given the specific facts and circumstances of a case, focused and informative jury instructions on the fallibility of eyewitness identification alone are adequate to assist the jury in evaluating the eyewitness identification at issue.[12] Id., 257–58.

Although we concluded in *Guilbert* that the trial court improperly had reasoned that expert testimony on eyewitness identifications was unnecessary because it concerned matters of common knowledge, we nevertheless concluded that the court did not abuse its discretion in excluding the proffered testimony because, given the nature of the identifications at issue, that testimony would not have been helpful to the jury. Id., 259. Specifically, because four of the five eyewitnesses who had identified the defendant as the perpetrator of multiple shootings had previous familiarity with the defendant, the risk of their misidentifying him was small. Id., 261. We agreed with the state that, "although there are exceptions, identification of a person who is well-

known to the eyewitness generally does not give rise to the same risk of misidentification as does the identification of a person who is not well-known to the eyewitness."[13] Id., 259–60. As to the remaining eyewitness, who was unacquainted with the defendant, we concluded that the exclusion of the expert testimony was an abuse of discretion, but that the impropriety was harmless in light of other evidence in the case.[14] Id., 265–67.

In the present case, the defendant argues that the Appellate Court improperly relied on *Guilbert* to conclude that the exclusion of expert testimony was not an abuse of discretion. He contends that the eyewitness in *Guilbert* that the Appellate Court discussed had more prior familiarity with the defendant in that case than DeJesus did with the defendant here, particularly because DeJesus did not know the defendant's name or any personal details about him aside from his appearance. According to the defendant, the inconsistencies in the descriptions of the perpetrator that DeJesus gave to the police and at trial suggest that she was confusing him with the perpetrator, and that she was adding additional details to her description of the perpetrator after choosing him from the photographic array, viewing the surveillance video and seeing him during the trial proceedings. The defendant claims additionally that the stress of the robbery, the presence of a weapon and the lack of corroborating evidence further undermine the reliability of DeJesus' identification of him such that expert testimony was necessary.

The state contends in response that the Appellate Court properly relied on *Guilbert* to conclude that DeJesus had sufficient prior familiarity with the defendant to minimize the risk of misidentification. According to the state, the fact that DeJesus had multiple previous contacts with the defendant, considered along with the other circumstances surrounding the identification, demonstrate that the trial court's ruling was not an abuse of discretion. We agree with the state.

At the outset, to the extent either of the parties have requested that we articulate a specific rule regarding the degree of familiarity that an eyewitness must have with a suspect before a trial court is justified in precluding expert testimony, we decline the invitation to do so. Our research has not disclosed any decision in which a reviewing court has proceeded in that fashion. Rather, the typical approach is to consider the nature and extent of the eyewitness' prior knowledge of the suspect, along with all of the other facts and circumstances of the crime and the subsequent identification of a perpetrator, to determine whether a trial court has abused its discretion in disallowing expert testimony.[15] This flexible approach is consistent with *Guilbert*, and indeed, with any determination within the discretionary purview of a trial court. Moreover, affording flexibility to

trial courts is desirable due to the myriad and unpredictable ways in which crimes occur and are witnessed and in which individuals may have had previous contact with each other. For example, in a case in which an eyewitness has a limited, stressful encounter with a criminal actor whose features are largely concealed, a high level of prior familiarity likely would be necessary to justify the exclusion of testimony on the risks of misidentification. See, e.g., *Hager* v. *United States*, 856 A.2d 1143, 1149 (D.C. App.) (no abuse of discretion to exclude expert testimony in case in which intruder wearing ski mask entered victim's bedroom at night and immediately ordered her to lie on floor; victim had seen intruder on daily basis outside apartment building for one year and recognized his eyes, mouth, complexion, height, build and voice), amended on reh., 861 A.2d 601 (D.C. App. 2004), cert. denied, 547 U.S. 1035, 126 S. Ct. 1609, 164 L. Ed. 2d 325 (2006). On the other hand, if a witness has ample opportunity to view a perpetrator under conditions conducive to an accurate identification and identifies him or her shortly thereafter, a lesser degree of familiarity may suffice.

After considering the totality of the facts and circumstances in the present case, we do not believe that the trial court abused its discretion in disallowing the defendant's proffered expert testimony. To begin, DeJesus had a substantial opportunity to view the perpetrator of the robbery as he entered the store during daylight hours, passed by her at the checkout counter at the front of the store, shopped for a time, then returned to the counter, where he stood in very close proximity to her as she rang up his purported purchases. Her description of the perpetrator's appearance, given prior to her identification of the defendant from a photographic array and including details not apparent from that array, was generally consistent with the defendant's appearance. Moreover, DeJesus' identification of the defendant was expeditious, taking place less than two hours after the robbery occurred, and she chose his photograph from the photographic array immediately. See *Upshur* v. *State*, 208 Md. App. 383, 402, 56 A.3d 620 (2012) (no substantial risk of misidentification where stabbing victim had previous contact with assailant, had "a couple of minutes in daylight" to view him during assault, gave "unremarkable but accurate" basic description of assailant and identified him "with no hesitation" [internal quotation marks omitted]), cert. denied, 430 Md. 646, 62 A.3d 732 (2013); *People* v. *Allen*, 53 App. Div. 3d 582, 584, 861 N.Y.S.2d 775 (2008) (fact that identification of defendant, who was previously known to witness, was made on same day of robbery "virtually eliminate[ed] the question of whether this identification may have been based upon faulty memory"), aff'd sub nom. *People* v. *Abney*, 13 N.Y.3d 251, 918 N.E.2d 486, 889 N.Y.S.2d 890 (2009). Importantly, DeJesus' recognition of the perpetrator as the defendant

occurred prior to his revealing a knife and accosting DeJesus, thereby making any testimony as to the effect of stress or the presence of a weapon on DeJesus' testimony of questionable relevance. As DeJesus indicated in her written statement, which was made prior to her identification of the defendant, the perpetrator had been in the outlet store before, and DeJesus subsequently testified that she had recognized and greeted the defendant as he entered the store.[16] See *Porter* v. *State*, 94 Nev. 142, 148, 576 P.2d 275 (1978) (no abuse of discretion to exclude expert testimony where "the victim was not under stress until the actual robbery [and] had a prior ample opportunity to observe [the defendant] absent stress-type conditions"). Previous to granting the state's motion to preclude expert testimony, the trial court already had ruled that the photographic array, which was not prepared by its administrator and which was presented to DeJesus along with a warning that a suspect may or may not be present, was not unnecessarily suggestive. Finally, the defendant did not establish a factual basis for his claim, made in his proffer, that the identification was cross-racial. In sum, much of the expert evidence that the defendant proposed to introduce would have been of limited utility to the jury.

As to the nature and extent of DeJesus' prior familiarity with the defendant, we do not consider it to be appreciably different than that of two of the witnesses' prior familiarity with the defendant in *Guilbert*, which, we concluded, made appropriate the trial court's decision to preclude expert testimony in that case. To reiterate, DeJesus had worked at the outlet store for approximately five months prior to the robbery, and she described the defendant as "a regular customer," although the precise number and nature of his previous visits is unclear from the record,[17] and she testified that she recognized him right away when he entered the store. The shooting victim in *Guilbert*, like DeJesus, recognized the defendant before any criminal activity occurred and further identified him by nickname after the shooting and then from a photographic array, but his testimony otherwise did not suggest a close relationship—only that he had known the defendant " 'for a while' and had 'had words' with him 'a couple of months' " earlier. *State* v. *Guilbert*, supra, 306 Conn. 223; id., 261 n.40. A second witness in *Guilbert* viewed the defendant only briefly, at night, after stressful events had commenced—multiple shots fired and cars colliding—and, like DeJesus here, recognized the defendant as a "regular customer" at a donut shop where she had worked for approximately one and one-half years. Id., 261 n.40. Although the second witness in *Guilbert* also knew the defendant's nickname, the circumstances of her identification of the defendant raised more concerns than the prompt, nonsuggestive police-administered photographic array utilized in the present case;

it did not occur until nine days later, when the witness identified the defendant from a picture in a newspaper. Id., 223.

Other cases involving a witness' prior familiarity with a perpetrator provide further support for our conclusion that DeJesus' previous contact with the defendant made the trial court's decision to exclude expert testimony an appropriate exercise of its discretion.[18] See *United States* v. *Wiley*, 545 Fed. Appx. 598, 599 (9th Cir. 2013) (no abuse of discretion to exclude expert testimony where sole eyewitness to robbery "had seen [defendant] several times before"); *People* v. *Abney*, supra, 13 N.Y.3d 262, 269 (no abuse of discretion to disallow expert eyewitness identification testimony in case involving armed robbery of barbershop by partially masked individual; witness identified perpetrator from " 'mug book' " and photographic array on same day, and recognized perpetrator from his voice and body type as someone witness had encountered "regularly in the neighborhood" over previous six months; second witness also recognized and identified defendant); *People* v. *Pacheco*, 38 App. Div. 3d 686, 688, 832 N.Y.S.2d 248 (no abuse of discretion to exclude expert testimony in murder case, "particularly since the identifying witness knew the defendant for months"), appeal denied, 9 N.Y.3d 849, 872 N.E.2d 888, 840 N.Y.S.2d 775 (2007); cf. *Haliym* v. *Mitchell*, 492 F.3d 680, 706–707 (6th Cir. 2007) (unnecessary to suppress identification resulting from suggestive lineup where, inter alia, child witness had seen individual who murdered his parents on four previous occasions); *Commonwealth* v. *Stoddard*, 38 Mass. App. 45, 48, 644 N.E.2d 234 (1995) (no need for special jury instruction on mistaken identification where victim gas station attendant "knew the defendant as a regular customer of the station and had encountered him numerous times over a year and one-half"); *People* v. *Montalvo*, 269 App. Div. 2d 328, 704 N.Y.S.2d 549 (2000) (unnecessary to suppress identification resulting from single photo identification procedure where "hotel manager . . . had seen defendant at the hotel on various occasions").

On the other hand, DeJesus' identification of the defendant is readily distinguishable from the identifications at issue in *State* v. *Clopten*, 223 P.3d 1103 (Utah 2009), on which the defendant relies. In that case, the multiple eyewitness identifications at issue all were highly problematic, with many of the factors affecting reliability clearly present, such that expert testimony would have been very helpful to the jury and, as the reviewing court held, should have been admitted.[19] Because of the myriad differences between *Clopten* and the present case, we cannot conclude that its holding is controlling here.

Finally, as to the defendant's contention that DeJesus gave somewhat differing descriptions of the perpetrator

at various times, thus suggesting that she altered her original description after viewing the defendant and/or the videotape of the outlet store robbery, we do not find the cited discrepancies to be particularly remarkable. Moreover, the fact that DeJesus gave a more complete explanation at trial than she did to the police regarding why she recognized the defendant does not compel a reversal of the trial court's ruling. Seemingly, the interviewing police officer simply took at face value DeJesus' statement that she had seen the perpetrator of the robbery at the outlet store previously and did not require of her any further, more detailed explanation of why she knew that to be the case.[20]

On the basis of the foregoing analysis, we conclude that the trial court's preclusion of the defendant's proffered expert testimony on the fallibility of eyewitness identifications was within the bounds of its broad discretion to exclude evidence that is not relevant or would not be significantly helpful to the jury. Accordingly, the Appellate Court properly concluded that the trial court did not abuse that discretion.

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, ZARELLA, EVELEIGH, ESPINOSA and ROBINSON, Js., concurred.

[1] We granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the trial court did not abuse its discretion by precluding testimony from the defendant's expert on eyewitness identification?" *State* v. *Williams*, 310 Conn. 959, 82 A.3d 626 (2013).

[2] Kaur testified at trial that she recognized the robber as someone who had visited another store owned by her husband. *State* v. *Williams*, supra, 146 Conn. App. 117–18. In a statement given to the police, she variously described the robber as a black male, who was thin or "a little heavy" with a " 'little beard' " or a "white beard," and who was approximately fifty years old and about five feet, five inches tall. She further described him as wearing a gray sweatshirt and/or a dark colored hoodie, a black skullcap and large metal eyeglasses. Id., 121–22.

[3] See *State* v. *Ledbetter*, 275 Conn. 534, 571–75, 881 A.2d 290 (2005) (although concluding that no per se rule is appropriate, recognizing that failure to give eyewitness instruction that photographic array may or may not contain suspect's photograph may render subsequent identification less reliable), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

[4] Prior to trial, the defendant filed a motion to suppress DeJesus' identification of him from the photographic array, arguing that the procedure employed was unnecessarily suggestive. At a hearing on the motion, DeJesus testified that she looked at the array "not long at all" because she "automatically knew who it was." According to DeJesus, she had seen the defendant "a couple times going to the store before," so she "automatically recognized him." DeJesus indicated that she had arrived at the Waterbury police station less than one hour after the robbery had taken place, and immediately had given her report after arriving. The police officer who administered the photographic array to DeJesus testified that he had shown her the array after typing up her statement, and he confirmed that her identification of the defendant was "immediate."

At the conclusion of the hearing, the trial court held that the identification procedure was not unnecessarily suggestive and, in any event, that it was reliable given the totality of the circumstances. See *State* v. *Outing*, 298 Conn. 34, 48, 3 A.3d 1 (2010) (if trial court finds that identification procedure was unnecessarily suggestive, identification still is admissible if court finds that it nevertheless is reliable based on totality of circumstances), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). Those circumstances included the short interval between the robbery and DeJesus' identification of the defendant, the fact that DeJesus did not hesitate when

identifying the defendant, DeJesus' prior familiarity with the defendant, the lack of any suggestion from the police, and the fact that DeJesus was instructed that a suspect was not necessarily included in the photographic array. The defendant did not challenge on appeal the trial court's ruling on his motion to suppress.

[5] The defendant further was charged in two separate part B informations with being a persistent dangerous felony offender in violation of § 53a-40 (a). *State* v. *Williams*, supra, 146 Conn. App. 120 n.7.

[6] In his supplemental proffer explaining how the proposed expert testimony would relate to the particular facts of this case, the defendant indicated that Penrod would testify that the following factors made DeJesus' identification of the defendant unreliable: the fact that the robber was wearing a hat and eyeglasses, which the defendant characterized as a "disguise"; the stress DeJesus endured as a result of being robbed at knifepoint; DeJesus' focus on a weapon, which distracted her attention away from the perpetrator's face; the relatively short duration of the outlet store robbery; the possibility that "unconscious transference" had caused DeJesus to confuse the defendant with the perpetrator, given her testimony that she had seen the defendant in the outlet store on prior occasions; the use of a simultaneous photographic array rather than a sequential photographic array; the fact that the defendant, unlike the other subjects in the photographic array, was wearing clothing bearing words, and appeared higher up in the frame than the other subjects; and any knowledge possessed by the administrator of the photographic array that the defendant was a suspect.

[7] At the time of the robbery, DeJesus had been working full-time at the outlet store, as a cashier and manager, for approximately five months. She worked at the outlet store by herself, and spent most of her time at the store's checkout counter. In addition to referring to the defendant as a "regular customer," DeJesus variously responded to questions about the extent of his previous visits as a "couple times," or "I can't really tell you how many times."

[8] Notably, the defendant was not wearing glasses in the photographic array from which DeJesus identified him, and the record indicates that he was not wearing them in court. Images from the surveillance video of both robberies depict the perpetrator in glasses.

[9] In *State* v. *Kemp*, supra, 199 Conn. 476, this court held that the trial court did not abuse its discretion in denying a defendant's request to present expert testimony on the reliability of eyewitness testimony, reasoning that the factors affecting such reliability were within the common knowledge of jurors and that defendants were protected adequately through cross-examination, closing argument and jury instructions that called attention to those factors. We later held similarly in *State* v. *McClendon*, supra, 248 Conn. 586–90.

[10] In *State* v. *Outing*, supra, 298 Conn. 58–62, this court indicated a willingness, in the proper case, to reconsider its holdings in *State* v. *Kemp*, supra, 199 Conn. 476, and *State* v. *McClendon*, supra, 248 Conn. 586–90. In *Outing*, we concluded that the defendant's claim that the trial court improperly excluded the testimony of his expert witness, concerning eyewitness identifications, at a pretrial hearing on his motion to suppress had been rendered moot in light of our disposition of another issue, and, in any event, that the exclusion of the testimony was harmless. *State* v. *Outing*, supra, 55–58. As to his additional claim that the court improperly excluded the expert's testimony at trial, we concluded that it had not been preserved. Id., 63.

[11] In view of our decision in *Guilbert*, the Appellate Court, sua sponte, ordered the parties to submit supplemental briefs addressing its applicability to the issue on appeal. *State* v. *Williams*, supra, 146 Conn. App. 117 n.3.

[12] Because our opinion in *Guilbert* makes it abundantly clear that trial courts retain the discretion to admit or preclude expert testimony on eyewitness identifications, depending on the particular facts and circumstances of the case; see *State* v. *Guilbert*, supra, 306 Conn. 257; we reject the defendant's contention that *Guilbert* instead held that such expert testimony presumptively is admissible in any case involving a disputed eyewitness identification. The defendant's claim in this regard focuses on two sentences in the majority opinion, which are taken out of context, and from characterizations of the majority opinion set forth in a concurring opinion, which is not an authoritative statement of the law. See *Reville* v. *Reville*, 312 Conn. 428, 459 n.29, 93 A.3d 1076 (2014), quoting *Kennedy* v. *Walker*, 135 Conn. 262, 274, 63 A.2d 589 (1948).

As the Supreme Court of Georgia has explained, "[r]ather than predetermining on an appellate level that qualified, pertinent expert evidence

must be admitted in every case where key eyewitness identification is unsubstantiated by other evidence, the modern trend is to allow trial courts to retain their discretion to weigh the admissibility of this evidence under a case-by-case analysis. . . . Thus, while the presence of certain factors in a case may strongly favor the admissibility of expert evidence on eyewitness identification, trial courts are not automatically required to admit the evidence; rather, the admissibility of the evidence remains within the trial courts' control subject to appellate review for abuse of discretion." (Citations omitted.) *Johnson* v. *State*, 272 Ga. 254, 256, 526 S.E.2d 549 (2000).

[13] We explained further that "[t]he primary concern expressed in cases discussing the problems with eyewitness identification relates to a witness observing and subsequently identifying a stranger. . . . Witnesses are very likely to recognize under any circumstance the people in their lives with whom they are most familiar, and any prior acquaintance with another person substantially increases the likelihood of an accurate identification." (Internal quotation marks omitted.) *State* v. *Guilbert*, supra, 306 Conn. 260 n.39. Moreover, "[t]he research on eyewitness identifications . . . almost exclusively focuses on individuals who are attempting to identify a stranger. If the eyewitness is identifying someone with whom he or she has been acquainted over a substantial period of time [for example, a family member, longtime business associate, neighbor, or friend], then expert testimony is not likely to assist the jury in evaluating the accuracy of a [witness'] testimony." (Internal quotation marks omitted.) Id.

[14] Many courts have held similarly to this court in *Guilbert*, namely, that exclusion of expert witness testimony on the fallibility of eyewitness identifications is not an abuse of discretion when, inter alia, the witness has prior familiarity with the perpetrator of a crime. See, e.g., *United States* v. *Wiley*, 545 Fed. Appx. 598, 599 (9th Cir. 2013); *Parker* v. *State*, 333 Ark. 137, 147, 968 S.W.2d 592 (1998); *Hager* v. *United States*, 856 A.2d 1143, 1149 (D.C. App.), amended on reh., 861 A.2d 601 (D.C. App. 2004), cert. denied, 547 U.S. 1035, 126 S. Ct. 1609, 164 L. Ed. 2d 325 (2006); *People* v. *Abney*, 13 N.Y.3d 251, 266–67, 918 N.E.2d 486, 889 N.Y.S.2d 890 (2009); *People* v. *Perez*, 85 App. Div. 3d 630, 925 N.Y.S.2d 501, appeal denied, 17 N.Y.3d 955, 959 N.E.2d 1030, 936 N.Y.S.2d 81 (2011); *People* v. *Pacheco*, 38 App. Div. 3d 686, 687–88, 832 N.Y.S.2d 248, appeal denied, 9 N.Y.3d 849, 872 N.E.2d 888, 840 N.Y.S.2d 775 (2007). Analogously, in other instances, reviewing courts have found no impropriety in trial courts' failures to give specialized jury instructions on eyewitness identifications when a witness had previous contact with the defendant. See, e.g., *State* v. *Trotter*, 280 Kan. 800, 807–808, 127 P.3d 972 (2006); *State* v. *Saenz*, 271 Kan. 339, 354, 22 P.3d 151 (2001); *Commonwealth* v. *Stoddard*, 38 Mass. App. 45, 48, 644 N.E.2d 234 (1995); *Johnson* v. *State*, 85 Wis. 2d 22, 29, 270 N.W.2d 153 (1978).

Because the existing jurisprudence in this area provides us with sufficient guidance to decide the defendant's claim, we decline the defendant's suggestion that we look instead to case law from a substantially different context, namely, decisions construing New York's " 'confirmatory identification' " exception to that jurisdiction's general rule that a defendant receive notice and an opportunity for a hearing if the state intends to introduce identification evidence that could have resulted from an impermissibly suggestive procedure. See *People* v. *Rodriguez*, 79 N.Y.2d 445, 449, 593 N.E.2d 268, 583 N.Y.S.2d 814 (1992). Because application of the confirmatory identification exception denies a defendant an opportunity even to explore the suggestiveness of an identification procedure, it necessarily is narrow in scope, reserved for situations in which, "however suggestive or unfair the identification procedure might be, there is virtually no possibility that the witness could misidentify the defendant." Id., 450. Stated otherwise, a defendant is not entitled to notice and a hearing to contest a suggestive identification procedure when "the witness knows [the] defendant so well as to be impervious to police suggestion." Id., 452. As previously noted, in the present case, the trial court, in denying the defendant's motion to suppress DeJesus' identification of him from the photographic array, explicitly found, following a hearing, that the procedure used was *not* impermissibly suggestive.

[15] See generally annot., 46 A.L.R.4th 1047, § 3 (e) (Supp. 2014).

[16] The dissent affords much significance to DeJesus' testimony that she was working on her laptop computer when the defendant entered the outlet store and, after greeting him, did not keep her gaze constantly trained on him as he moved about gathering merchandise. We are not convinced that this circumstance raises a serious risk of misidentification. As DeJesus explained while being cross-examined by defense counsel, she looked up and greeted the defendant as he entered the outlet store, and she saw no reason to fixate on his facial features because she "already recognized him when he walked in" as "a regular customer" whom she had seen in the store before. Moreover, after she rung up his purported purchases, she

looked up at his face and told him the amount due twice, because after she had told him the first time, "he wasn't doing anything, he wasn't getting any money out or anything," but rather, "was just waiting there." Only thereafter did DeJesus look down and notice that the defendant was holding a knife. After examining the totality of the encounter, we are not persuaded that DeJesus was so distracted that she had an inadequate opportunity to view the defendant.

[17] The defendant, and the dissenting justice, essentially ask us to presume from the lack of definitive evidence as to the specifics of the defendant's previous visits to the outlet store that those visits were minimal in number and that he and DeJesus had never spoken or otherwise interacted prior to the day of the robbery. This we will not do. We reiterate that we review the trial court's ruling only for an abuse of discretion. It is axiomatic that it is the defendant's burden, as the appellant, to establish an abuse of discretion requiring reversal of the judgment; *State* v. *Ramos*, 261 Conn. 156, 175, 801 A.2d 788 (2002); and further, to provide an evidentiary record that would support that determination. *State* v. *Ryder*, 301 Conn. 810, 835, 23 A.3d 694 (2011). Moreover, as we have consistently and repeatedly explained, the abuse of discretion standard is highly deferential. When applying that standard, "every reasonable presumption should be given *in favor of the correctness of the court's ruling*." (Emphasis added; internal quotation marks omitted.) *State* v. *Dupas*, 291 Conn. 778, 783, 970 A.2d 102 (2009). In sum, the defendant cannot meet his burden of showing that the trial court abused its discretion in disallowing expert testimony by relying on assumed facts that are not evidenced by the record.

[18] The dissent, in its discussion distinguishing extrajurisdictional decisions, in large part includes cases that we have not cited here as analogous to the present one, but that we have cited only in a previous footnote for the general proposition that a witness' prior familiarity with a defendant may justify the exclusion of expert testimony on the fallibility of eyewitness identifications. See footnote 14 of this opinion.

[19] In *State* v. *Clopten*, supra, 223 P.3d 1116, two witnesses to a shooting outside a nightclub, which occurred after a rap concert, had claimed very limited previous familiarity with the defendant, not having known him prior to the night in question. One witness, the victim's girlfriend, stated that the victim had pointed the defendant out to her prior to the concert, and indicated that the two were enemies. Id., 1116–17. She viewed the shooting from a distance of fifteen feet and described the shooter to police as "the guy in the red." (Internal quotation marks omitted.) Id., 1115. Soon thereafter, while still frantic over what had occurred, the victim's girlfriend identified the defendant from a distance of thirty five feet at a live roadside show up consisting of the defendant and three of his cohorts, all of them handcuffed. Id., 1115–16. Although both the defendant and one cohort had been wearing red sweatshirts earlier in the evening, the cohort had since removed his. Id., 1115. Moreover, the police had encouraged the victim's girlfriend to identify a perpetrator, telling her to "[d]o it for [the victim] . . . ." Id., 1116. She later claimed to recognize the shooter by his distinct hairline, but other witnesses indicated that the shooter had a hood pulled over his head during the shooting. Id.

A second eyewitness in *Clopten*, who identified the defendant from a photographic array, claimed to have spoken briefly to a man in a red sweatshirt twice during the evening. Id., 1115. She said that the shooter had not worn red pants, although the defendant did, and seemed to be describing the red sweatshirt worn by the defendant's cohort. Id., 1116. Both the victim's girlfriend and the second witness were of different races than the defendant. Id. A third eyewitness had accompanied the defendant to the concert on the night of the shooting. Id., 1115. That witness initially denied seeing the shooting, but identified the defendant after being threatened with prosecution. Id., 1115–16. Thereafter, the witness disappeared and was unavailable to testify at trial. Id., 1116.

[20] The trial transcript reflects the following exchange between defense counsel and Detective Orlando Rivera from the Waterbury Police Department, who took DeJesus' statement and showed her the photographic array:

"Q. Did you ask her why she picked [the defendant]?

"A. Yes. At which point when she identified him she said, that's the man that robbed the store.

"Q. And did she give you any details about why she picked him as opposed to just saying, that's the man?

"A. Well, she had remembered that the gentleman had entered the store previously.

"Q. So she told you that she had previously seen [the defendant] at the [outlet] store?

"A. She had . . . stated, when I had spoke[n] to her, while taking her statement, that the man that robbed my store had come into the store previously. She remembered the man that robbed her as being in her store prior.

"Q. And so when you asked her, what is it about him that makes you say, he's the robber, that was the only answer she gave you?

"A. She was adamant that was the man that robbed the store.

"Q. And she didn't say, I recognize any type of facial features on the man from the robbery?

"A. No."